**F I L E D**
United States Court of Appeals
Tenth Circuit

**JUL 7 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MARC N. GEMAN,

     Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION,

     Respondent.

No. 01-9512

---

**On Petition For Review Of A Final Decision**
**of the Securities and Exchange Commission (No. 3-9032)**

---

Donald T. Trinen, Esq., Hart & Trinen, LLP of Denver, Colorado, Attorneys for Petitioner.

Leslie E. Smith, Senior Litigation Counsel (Meyer Eisenberg, Deputy General Counsel, Jacob H. Stillman, Solicitor, and Kermit B. Kennedy, Special Counsel, with her on the brief), Securities and Exchange Commission, Washington, D.C., Attorneys for Respondent.

---

Before **BRISCOE, HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

---

# I
## A. Overview and Basis for Jurisdiction

Mr. Marc Geman brings a petition for review of a disciplinary order issued by the SEC. Mr. Geman was a registered broker-dealer and investment adviser; he was also the chief executive officer of a firm called Portfolio Management Consultants, Inc. (the firm). In proceedings before an administrative law judge (ALJ), Geman was found to have violated several provisions of the securities laws, as described *infra*. In an opinion reviewing the ALJ's disposition (the SEC Opinion), the SEC affirmed all of the findings of violations but reduced the sanctions imposed.[1] Geman was barred from association with any securities or investment firm, but was permitted to apply for relief from that ban after three years, and Geman was fined $200,000. (The ALJ had imposed a lifetime ban and a fine of $500,000.) Separate proceedings against the firm and its president, based on the same events, had previously been settled.

Geman filed a timely petition for review. This court therefore has appellate jurisdiction under section 9 of the Securities Act of 1933, 15 U.S.C. § 77i; section 25(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a)(1); and section 213 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-13.

---

[1]The ALJ found that the firm's customers had always received best execution, meaning the best price reasonably available at the time of the transaction. On review, the enforcement staff asked the SEC to overturn that finding. The SEC ruled that the enforcement staff had failed to prove a violation of the duty of best execution, but it did not affirm the ALJ's finding that the firm had always provided best execution and expressed its strong concern that the firm's deficient record keeping practices (which are discussed *infra* in Part II-F) made it difficult for the enforcement staff to prove that customers had not always received best execution.

*B. Background*

Petitioner was chairman and CEO of the firm during the relevant time, October 1992 through April 1994.[2] The ALJ found that "Geman was responsible for operations of the broker-dealer part of the business, encompassing administrative and financial functions as well as compliance and trading." ALJ Decision at 3. The firm's primary business during that time was sponsoring a comprehensive "individualized managed account" service, which in the industry is called a "wrap fee" program. Under the wrap fee program, the firm's customers paid an "all-inclusive" fee calculated as a percentage of the customer's assets under management. In return, the firm provided brokerage, advisory, and custodial services.

The firm assisted its customers in creation of a written investment policy, in the allocation of assets, and in the selection of portfolio managers, but did not recommend specific securities. Decisions such as the selection of securities to buy or sell were made by the customers with the aid of portfolio managers who contracted with, but were independent of the firm. The portfolio managers had complete discretion in advising the firm's customers about their accounts. Trades were executed through the firm.[3] The firm also monitored the performance of the accounts and distributed quarterly performance

---

[2]Our recitation of the facts is taken primarily from the SEC's opinion, which is published at 2001 WL 124847. With one exception noted in the text, neither party challenges the facts as determined by the ALJ and as discussed in the SEC's opinion.

[3]The SEC noted that the record was unclear as to whether other broker-dealers may have been used to execute some trades. SEC Opinion at 5, n.12.

reviews. The firm had about 800 customers in the wrap fee program, with over $200 million in assets under management.

In its promotional literature, the firm represented that it would strive to ensure "best net price" and "best execution" for each transaction. Doc. 74 at 4. "The duty of best execution . . . requires that a broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998) (en banc).[4] Significantly, the firm specifically represented that it was undertaking fiduciary responsibilities to its customers, as in a promotional brochure which said: "[A]s an independent fiduciary, PMC is dedicated to providing the independent advisory and administrative services necessary to support you in meeting your unique and specialized goals and objectives." Doc. 74 at 3.

The enforcement proceeding grew out of a change in practice instituted by the firm after a period of heavy losses. Before October 1992 the firm had acted only on an agency basis; that is, it executed trades on behalf of its customers with third parties. But in October 1992, Geman directed the firm's traders to identify transactions in which the firm could profit by becoming a principal. Thus, for example, when a customer placed an order to sell a certain stock, the firm might buy the stock from the customer, rather than

_____

[4]As the brochure seems to recognize, the duty of best execution is a legal duty inherent in the relationship of the broker-dealer and its customer, arising from the duties of undivided loyalty and reasonable care under the common law of agency, and thus would have applied to the firm absent the firm's express promises. *Newton*, 135 F.3d at 270.

merely acting as an intermediary by arranging a sale to a third party. In this example, the firm would then "cover" by selling the stock it had just purchased from its customer. In each instance of principal trading, whether the customer's order was to buy or to sell, the firm would cover by completing an offsetting trade. The covering trades were always for the same number of shares of the same stock and were executed very promptly, always on the same day as the transaction with the customer of the firm.

The firm's traders were directed to evaluate each order to determine whether it was in the firm's interest to execute the trade as a principal or as an agent. The customer's price was always the "NBBO," the national best bid and offer price based on price quotations.[5] If the traders thought it likely that the firm could execute a covering trade at a more favorable price by the end of the trading day, the firm would execute as principal. Over a period of about 18 months, the firm executed over 8,000 trades as principal and generated net profits of over $460,000, with two-thirds of its covering trades being profitable to the firm and one-third unprofitable.[6]

The firm obtained the customers' consent to a modification of the customer agreement to allow it to trade in the capacity of a principal by sending the customers a letter, approved by Geman, which included the language to be added to the agreement.

---

[5]More specifically, the NBBO is the highest quoted bid price and lowest quoted offer price from among all quotations entered in the Consolidated Quotation Service. SEC Opinion at 3.

[6]The ALJ found that this represented about ten percent of the total transactions completed by the firm for its customers. ALJ Decision at 5.

The only explanation offered in the letter was that this and other changes to the customer agreement were the result of "new regulatory interpretations and technological improvement to [the firm's] system capabilities." Doc. 140. The letter went on to say that the modifications of the customer agreement were necessary to allow the firm "to fully utilize these automated systems." *Id.* There was no evidence that any technological improvements or new regulatory interpretations actually were related to the decision to engage in trading as a principal. There was no disclosure of the firm's intent to make profits from these transactions as principal. The letter said that there would be no changes to the fees charged.

Prior to March 1993, the firm reported the trades in which it participated as a principal through the Automated Confirmation Transaction service, a trade reporting service operated by the National Association of Securities Dealers (NASD). These reports included the time of each transaction. In 1992, the NASD informed the firm that these principal trades with customers could not be reported through its service because the trades were "riskless." Although Geman disagreed with the NASD's characterization of the trades as riskless (as he does in this appeal), he agreed to stop reporting the trades as the firm had been doing. From March 1993 to December 1993, no alternative procedure was implemented for recording the details of the firm's trades in the capacity of principal. Although the trades were not being reported, the firm continued to send its customers confirmation statements which included the following language: "your price is

reported price difference is zero."[7]

## C. The SEC's Opinion

The Commission, on review of the order of the Administrative Law Judge, noted that the firm had held itself out as a fiduciary. The Commission held that the firm's conduct was fraudulent because, contrary to the fiduciary's duty of full disclosure, the firm's disclosures regarding the change to principal trading were made "in a highly misleading manner." The purported reasons for the decision, changes in regulations and in technology, were not actually factors in the decision at all. The firm failed to disclose that the primary motivation was to earn profits, and misleadingly represented that its fees would not be affected.

Another result of the firm engaging in trades as a principal, the SEC found, was that the customers were deprived of the opportunity to take advantage of "price improvement services" offered at the time by two of the wholesale dealers that the firm used in executing its trades. These price improvement services guaranteed that the customer's market order would be executed at the NBBO and offered the possibility of execution at better prices. The wholesale dealers were able to get these better prices for a

---

[7]The firm ostensibly included this awkward phrase on the required confirmation statements because an SEC rule required it, when acting as a principal, to disclose any "mark-up, mark-down, or similar remuneration" received by the firm. *See* 17 C.F.R. § 240.10b-10(a)(8)(i)(A). The firm was also required to report its principal trades to the NASD. The intended meaning of the phrase was, as we understand it, that the firm had not profited on the transaction, that the "price reported," i.e. the price received by the firm in a covering sale or paid by the firm in a covering purchase, was the same as the price received or paid by the firm's customer.

small but significant portion of trades, somewhat less than ten percent. When the firm acted as principal in a trade with its customer, the customer had no possibility of benefitting from the price improvement service.

The SEC found that the "your price is reported price difference is zero" language in the firm's confirmation statements was deceptive in that it suggested that there was no difference between the customer's price and the price the firm obtained for itself in its covering trade, when in fact in most cases there was a difference. The SEC also held that the confirmations violated Exchange Act Rule 10b-10(a)(8)(i)(A), 17 C.F.R. § 240.10b-10(a)(8)(i)(A), a regulation requiring a dealer that is not a market maker, when trading for its own account, *i.e.,* as a principal, to disclose in writing any "markup, markdown or similar remuneration it receives." SEC Opinion at 20. Finally, the SEC found that it was undisputed that the firm had violated record keeping requirements when it failed to institute a reporting system to replace the reports that the NASD had told the firm could no longer be filed with their service.

The SEC held that Geman "willfully aided and abetted and caused the Firm's violations," including the violation of the record keeping requirements. The sanctions ordered have already been described.

## II

### *A. Issues presented and standard of review*

Geman raises six issues on appeal. He contends that no fraud was committed by the firm in its failure to disclose its profit motive for adoption of the principal trading program, and likewise that the failure to disclose the price improvement opportunity was not fraudulent because there was no evidence that any customer would actually have benefitted from the service. We are further asked to review the conclusion that the firm's customer confirmation notices were not required to report profits on trading in a principal capacity. Also with respect to the confirmation statements, Geman contends that there was no misrepresentation in the statement's inclusion of standard language that the price received by the customer was the same as the prevailing market price. Geman also contends that he should not have been held responsible for the firm's reporting deficiencies. Finally, Geman contends that he should not have been disciplined at all because he did nothing wrong, and alternatively that the punishment was too severe.

In reviewing the decisions of the Commission, we accept its findings of fact unless they are not supported by substantial evidence. *See Steadman v. SEC*, 450 U.S. 91, 96 n.12 (1981). We defer to the agency's interpretation of the statutes it administers and its rules and regulations. Sanctions imposed by the Commission are reviewed for abuse of discretion. *See C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1438 (10th Cir. 1988).

### *B. Fraud in non-disclosure of motive for principal trading*

We begin with Geman's attack on the Commission's conclusion that the firm violated various anti-fraud provisions by not disclosing the firm's profit motive when it engaged in principal trading. Geman contends that the firm was not obliged to make any disclosure beyond the fact that it would begin acting as a principal in some trades and that this is so whether or not the firm acted in a fiduciary capacity. Whether the firm must be held to a fiduciary standard is significant in determining the extent of its disclosure duties. We agree with the Commission that the firm should be held to the standard of a fiduciary with respect to its wrap fee customers.

Geman argues emphatically that the firm should not be held to a fiduciary standard because it was not acting as an investment advisor with respect to the transactions. However, Geman fails to address what we perceive to be the cornerstone of the Commission's holding on this point – that the firm held itself out as a fiduciary as noted *supra*. Fundamental principles of agency law support the Commission's conclusion that a fiduciary relationship was formed. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency*, § 1(1) (1958). Here, the customers' response to the firm's promotional material, which included the statement quoted above to the effect that the firm would act as a fiduciary, established an agency with its attendant fiduciary duties. *Id.* at § 13 ("An agent

is a fiduciary with respect to matters within the scope of his agency.").[7]  Accordingly, the firm must be held to fiduciary duties with respect to the wrap fee program.

The duties of a fiduciary are strictly defined.  "Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his customers."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).  As the Commission said here, "when a firm has a fiduciary relationship with a customer, it may not execute principal trades with that customer absent full disclosure of its principal capacity, *as well as all other information that bears on the desirability of the transaction from the customer's perspective."*  SEC Opinion at 13 (emphasis added).  Other authorities are in agreement.  For example, the general rule is that an agent charged by his principal with buying or selling an asset may not effect the transaction on his own account without full disclosure which "'must include not only the fact that the agent is acting on his own account, but also all other facts which he should realize have or are likely to have a bearing upon the desirability of the transaction, from the viewpoint of the principal.'"  *Arst v. Stifel, Nicolaus & Co.,* 86 F.3d 973, 979 (10th Cir. 1996) (applying Kansas law) (quoting *Restatement  (Second) of Agency* § 390 cmt. *a* (1958)).

---

[7]Neither the ALJ Decision nor the SEC Opinion states that all customers in fact received the promotional materials.  But because both decisions relied on the brochure, because of Geman's omission of any challenge on this point and because of our deferential standard of review, we view the issue as the administrative decision makers did.  Also, we think the charges against Geman would still have to be viewed as very serious even if less than all firm customers were misled.

At this point it might be helpful to review the key facts underlying this issue. The firm's brochures told prospective customers that the firm would act as a fiduciary in providing advisory *and administrative* services. The letters through which the firm solicited its customers' assent to the practice of principal trading told them that the changes to the customer agreement were necessary to allow the firm to utilize new automated systems. This constituted both an affirmative misrepresentation – offering a completely false reason for asking the customers to consent to the amendment of the agreement – and a misleading omission – failing to disclose the firm's profit motive and, in particular, the fact that the entire plan rested on the firm's expectation that in many cases a better price for a particular trade would be available on the same trading day that the customer's order was to be filled.

Geman contends that any reasonable investor would have understood that the firm hoped to profit by trading as a principal and therefore that there was no duty to disclose this fact. We may assume that Geman is correct that a reasonable investor would understand that the firm hoped to profit by trading as a principal. But the firm did not merely hope to profit at some undefined time. Instead, the firm calculated, correctly for the most part as it turned out, that it could profit *on the same trading day that the customer's order was filled.* As the Commission stated in its opinion, the firm "sought to cover its principal trades as quickly as possible and apparently did so 'by the end of the trading day.'" SEC Opinion at 23. (See discussion in Part II-D, *infra*.) The fact that a

more favorable price was often available on the same day was a material fact which the firm had a duty to disclose.

Geman also argues that the fact that the firm hoped to profit from trading as a principal was not material because the customers still received "best execution." This argument is not persuasive. The customers *may* have received best execution,[8] meaning the best price reasonably available at the time of the transaction, but customers might have chosen to give different instructions had they been fully and properly informed. For example, the customers could have done what the firm itself did to improve its return, and that is to place limit orders in an attempt to benefit from price changes during the trading day.[9]

It is clear that the firm did not live up to its duties of disclosure as a fiduciary. By failing to inform its customers fully about the way it was conducting trades as a principal, the firm deprived its customers of the opportunity to obtain for themselves the more favorable prices that the firm was realizing in two-thirds of its principal trades. Clearly the firm was guilty of breaching its fiduciary duties in this respect.

---

[8]See note 1, *supra*.

[9]We note also that the ALJ's finding that the firm fulfilled its duty to provide best execution by executing its trades with the customers at the NBBO was based on *In re Merrill Lynch Securities Litigation*, 911 F. Supp. 754, 771 (D.N.J. 1995), *affirmed sub nom. Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 115 F.3d 1127 (3d Cir. 1997), in which the district judge found that the duty of best execution was ambiguous due to evolving standards. That case was subsequently reversed by the en banc court, 135 F.3d 266 (3d Cir. 1998), which held that the evidence was sufficient to require a jury to decide whether, at the time in question, it "was feasible to maximize the economic benefit to the customer by taking advantage of better prices than the NBBO." *Id.* at 272.

*C.  The SEC conclusion of violation of the anti-fraud rules*

We turn next to the question whether this conduct violated the anti-fraud rules, as the SEC found.  With regard to this issue, we note that at oral argument Geman contended that Rule 10b-5 is a codification of the common law of fraud and deceit and that this proceeding marks an unwarranted expansion of that doctrine because, according to him, there was no intent to defraud, no reliance, and no injury here.  Although we usually do not address contentions made for first time at oral argument, we believe that it is important to point out that this argument is based on a faulty premise.  An enforcement action by the Commission is much different from a common law action for damages: "[T]he antifraud provisions of the securities laws are not coextensive with common law doctrines of fraud.  Indeed, an important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common law protections by establishing higher standards of conduct in the securities industry."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 388-89 (1983) (footnote omitted).  The SEC is not required to prove reliance or injury in enforcement actions.  *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363 & n.4 (9th Cir. 1993); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).  *See also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963) (similar holding under the Investment Advisers Act).

Aside from the fact that Geman's argument is unsupported by precedents, it fails when considered in light of the overall aims of the securities laws and common sense.  In

effect, Geman proposes that the Commission should take no action until an investor has suffered actual injury even when, as is the case here, the Commission is aware that a broker-dealer or investment adviser is employing deceptive practices which are virtually certain to lead to investor losses. The courts have rejected this contention for sound policy reasons.

Unfortunately, the Commission has not assisted us by stating specifically what elements, short of the elements of common law fraud, it *did* have the burden of establishing in this enforcement action. The SEC Opinion affirmed the ALJ Decision that the inadequate disclosures violated the following anti-fraud provisions: Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 C. F. R. § 240.10b-5; and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6. Section 17(a) of the Securities Act of 1933, in pertinent part makes it unlawful

> for any person in the offer or sale of any securities . . . directly or indirectly –
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

Similarly, Section 10(b) of the Securities Exchange Act provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, . . . –

. . .

    (b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, promulgated under authority of this provision of the

Exchange Act of 1934, provides in part:

    It shall be unlawful for any person, directly or indirectly, . . .
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

    in connection with the purchase or sale of any security.

17 C. F. R. § 240.10b-5.

    Finally, Sections 206(1) and (2) of the Investment Advisers Act of 1940 provide:

    It shall be unlawful for any investment adviser . . ., directly or indirectly –
    (1) to employ any device, scheme, or artifice to defraud any customer or prospective customer;
    (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any customer or prospective customer[.]

15 U.S.C. § 80b-6 (1-2).

    Other courts have indicated that the following are the elements the SEC must

prove to establish a misrepresentation violating Rule 10b-5: "(1) a material

misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter,

[and] (4) use of the jurisdictional means . . . ." *SEC v. Rana Research, Inc.*, 8 F.3d 1358,

1363 (9th Cir. 1993) (citing *SEC v. Hasho*, 784 F.Supp. 1059, 1106 (S.D.N.Y. 1992), and *SEC v. Tome*, 638 F.Supp. 596, 620 & n. 46 (S.D.N.Y. 1986)). Depending on the circumstances, the first element may be satisfied in alternative ways, such as by showing an omission where there is a duty to speak. *SEC v. Hasho*, 784 F.Supp. at 1106. Such an omission has been established here. With respect to this aspect of the case, Geman has challenged only the materiality element, and we have rejected that challenge.

The Commission's decision in this case is consistent with its prior interpretations of the anti-fraud provisions. *See In re Arleen W. Hughes*, 27 S.E.C. 629 (1948), *affirmed*, 174 F.2d 969 (D.C. Cir. 1949). This view, to which we owe deference in any event, *see Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), is a reasonable one, we conclude. We think that the Commission's decision in Mr. Geman's case is also supported by the case law, especially *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) (violations of the Investment Advisors Act). We think the firm's course of conduct, for which Geman was clearly responsible, does indeed fall within the reach of the anti-fraud provisions as the Commission decided. Thus the Commission's ruling holding Geman liable for the non-disclosures concerning the firm's principal trading should be upheld.

*D. Fraud in depriving customers of price improvement services*

As described above, when the firm participated in transactions as a principal, the customer would lose the possibility of getting a price better than the NBBO, a price that was achieved in some trades through the "price improvement" services offered by two of

the wholesale dealers that executed trades for the firm. The Commission found that the firm had violated its fiduciary duties and the anti-fraud provisions discussed in Part II-B, *supra*, by failing to disclose this fact. We agree.

Geman contends that the firm's failure to disclose this fact does not constitute a violation of the anti-fraud provisions, absent evidence that use of the price improvement service would actually have benefitted any customer. This proposition is similar to the previous one in that Geman contends that he and the firm are immune from discipline absent a showing of one of the elements of common law fraud, in this case actual loss. And this contention fails for the same reason – because the SEC in an enforcement action is not required to prove all of the elements of common law fraud.

In his discussion of this issue in his opening brief, Geman repeatedly relies on the assertion that the Commission made a determination that the firm had provided best execution, and he goes on to argue vehemently that this "precludes the Commission's finding of fraud based on a failure to inform customers that a price improvement opportunity was available." Petitioner Geman's Opening Brief at 13. The Commission did *not* make a finding that the firm had provided best execution, and counsel's repeated assertions to the contrary are very troubling to this court.

As noted *supra*, the ALJ made a finding of best execution which the Commission declined to overturn, commenting that the firm's "record keeping deficiencies detrimentally affected the Division's ability to assemble the requisite evidence in this

case." SEC Opinion at 29.[10] The Commission further stated that, even though the Enforcement Division had been unable to prove a violation of the duty of best execution, "we nevertheless are deeply troubled by the Firm's trading practices, *particularly its failure to utilize a price improvement service on behalf of its customers*." *Id*. at 30 (emphasis added).

### E.  *The firm's confirmation statements*

The firm was required by Commission Rule 10b-10 to send a written confirmation of each trade executed for a customer. The Commission affirmed the ALJ's decision that the firm violated a subsection of this regulation which, under the circumstances of the firm's principal trading, required the firm to disclose its profits from its covering trades in its confirmation statements. Geman asserts that the Commission erred as a matter of law in its determination that the firm was required to disclose in its confirmation statements any profits it realized from trading as a principal.

As we have seen, when a customer placed an order with the firm, the traders were instructed to gauge whether the transaction was one on which the firm might realize a profit by acting as a principal. If so, the firm would buy the securities the customer wanted to sell or, if the order were a buy order, would "sell" to the customer. In the latter event, because the firm did not have an inventory from which to make the sale, the firm would commit itself to acquiring the securities for sale to the customer at the customer's

---

[10]The record keeping deficiencies are discussed *infra* in Part II-F of this opinion.

stated price. *See* SEC Opinion at 7-9. Whether the trade it was executing as a principal was a buy or a sell order, the firm would then seek to "cover" its commitment by an off-setting transaction. *Id.* Thus, if it bought 50 shares of a particular stock from the customer, it would immediately try to sell those shares. Often, about two-thirds of the time, the firm would succeed in executing a cover transaction at a profit.

The provision of the Rule at issue states, in pertinent part, that if a broker or dealer is not a "market maker" in the security being traded

> and, if, after having received an order to buy from such customer, he purchased the security from another person to offset a contemporaneous sale to such customer or, after having received an order to sell from such customer, he sold the security to another person to offset a contemporaneous purchase from such a customer, the amount of any mark-up, mark-down, or similar remuneration received in an equity security [must be disclosed].

17 C.F.R. § 240.10b-10(a)(8)(i)(A) (2002).[11] In this case, the SEC held that for each trade that the firm executed as a principal, the firm's profit constituted a "markup, markdown or similar remuneration" that the firm was required to report to the customer who had placed the original order. This holding followed from the conclusion that the firm's covering trades were so closely connected in each instance to the customer's order that initiated the trading that the two should be viewed as two halves of a single transaction, rather than as separate events.

In announcing the adoption of this rule, the SEC had said that "the purpose of

---

[11]The regulation has since been amended so that this provision no longer appears in this subsection.

requiring dealers in what are characterized as 'riskless' principal transactions to disclose their mark-up or mark-down is to 'enable customers to make their own assessments of the reasonableness of transaction costs in relation to the services offered by broker-dealers.'" SEC Opinion at 21 (quoting *Securities Confirmations*, 15 SEC Docket 1245, 1250).  The Commission rejected Geman's argument that the regulation is inapplicable to the firm's trading because the firm's trades were not "riskless."  The Commission reasoned that the critical features were that the principal trades at issue were contemporaneous and designed to be offsetting, which are the two conditions set out in the rule.

The Commission cited an opinion letter issued from the staff of the Division of Market Regulation in 1980.  In that letter, addressing this same issue under similar circumstances, the staff had opined that disclosure under the rule was required because the transactions at issue, like those here, were "designed to be offsetting," and were in close time proximity.  The SEC observed that it was implicit in the letter's reference to close time proximity that a brief interlude during which the firm was at risk due to changes in the market was not sufficient to negate the disclosure rule.  Acknowledging that the "Market Regulation Letter" was not binding, the SEC adopted its reasoning while rejecting Geman's arguments.

On appeal, Geman relies again on the contention that the regulation is inapplicable. His argument focuses on the assertion that the firm's principal trades were not "riskless" transactions.  The SEC counters with the assertion that the rule speaks to transactions that

are contemporaneous and offsetting, without use of the terms "risk" or "riskless."

Geman does not dispute that the trades were designed to offset the trades done to fill the customers' orders. As noted, the traders were instructed to execute the offsetting trades quickly, always by the end of the trading day. The Commission's ruling that this temporal element satisfies the rule's requirement that the trades be "contemporaneous" appears to be a reasonable one. We need to say no more than that, given the deference due to the agency's interpretation of its own rule. *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).

The Commission also ruled that the use in the confirmation statements of the phrase "your price is reported price difference is zero" was misleading because it "suggested falsely that there was no difference between the prices customers paid or received in principal transactions with the Firm and the prices the Firm paid or received in its covering trades that were reported . . . ." SEC Opinion at 23. This holding again rested on the conclusion that the firm's trades with its customers and its subsequent covering trades should be viewed together. Having decided to affirm the Commission's ruling that the firm was required to disclose its profits on the confirmation statements, we also affirm the ruling that the quoted phrase was misleading because it suggested that there were no such profits.

*F. Geman's liability for the firm's record keeping failures*

This is the one area in which Geman contends that the SEC made an erroneous

finding of fact. It is undisputed, however, that the firm failed to report its principal transactions in violation of applicable rules[12] from March 1993 to December 1993, as described *supra*. It is undisputed that the person with primary responsibility for reporting these trades was the firm's chief financial officer, Vali Nasr.

The Commission found that Nasr had no prior experience supervising a trading department, which Geman asserts is clearly erroneous. Geman cites a single page of the hearing transcript, where Nasr testified regarding his duties at the broker-dealer firm by which he was employed for about a year just prior to his joining Geman's firm. Nasr testified that he was the treasurer of that firm and that: "I oversaw – you know, made sure – I kept track of the books and records and I did the regulatory reports." (Transcripts Vol. 3 at 541.) Any inconsistency between this statement and the SEC's finding is less than obvious. More importantly, however, Mr. Nasr later in his testimony was directly asked, "Now, prior to coming to PMC, had you ever had responsibility for supervising a trading department?" Mr. Nasr answered, "No." (*Id*. at 547.) We cannot say, in light of this testimony, that it was clearly erroneous for the SEC to find that Nasr had no experience supervising a trading department.

In any event, the issue is whether the Commission properly concluded that Geman was responsible for aiding and abetting the record keeping failures of Nasr and the firm. In support of its conclusion, the SEC cited the fact that Geman had personally conducted

---

[12]The applicable rules are found at 17 C.F.R. § 240.17a-3(a)(6-7).

the correspondence with the NASD which culminated in the NASD's decision to require the firm to cease reporting the principal trades in the way it had been. Thus, Geman clearly was aware of the cessation of reporting under the former system and, with his extensive background and experience, surely knew that an alternative reporting practice was necessary (which he does not deny). In spite of this, the SEC observed, Geman "took no steps to ensure that – or inquire whether – [the firm] was making alternative arrangements to satisfy record keeping obligations. Geman's inaction, which was at the very least reckless, amply supports a finding that he wilfully aided and abetted the Firm's record keeping violations." SEC Opinion at 34.

Geman argues that he cannot be held at fault except under a theory of strict liability because he reasonably delegated the record keeping duties to Nasr. We disagree. Mr. Nasr's testimony establishes that Geman was more than just his titular supervisor with respect to the reporting requirements. Nasr testified as follows on direct examination by the SEC enforcement division attorney:

> Q. Who was responsible for determining what kinds of records should be kept to meet the requirement of recording the time of execution with a customer?
>
> A. I would say I would have been responsible to make sure that would happen.
>
> Q. Did Mr. Geman also have responsibility for that?
>
> A. Well, again, I mean, I reported to Mr. Geman, and *Mr. Geman was the compliance officer* and the head of the firm so, I mean, I was the responsible party line person but *Mr. Geman was involved as well*.

Transcripts vol. 3 at 551 (emphasis added).

We think that this is sufficient factual basis for the conclusion that Geman aided and abetted the violations with a state of mind of recklessness, if not willful disregard.

### G. The sanctions

As we have noted, the SEC affirmed the ALJ's decision that Geman should be barred from associating with a broker or dealer, investment adviser, member of a national securities exchange or member of a registered securities association, but the agency held that Geman should be allowed to re-apply after three years. The Commission agreed that a substantial fine was appropriate, but reduced the fine from $500,000 to $200,000, which is more accurately described as three fines totaling that amount.

The sanctions were imposed under the authority of Section 21B of the Exchange Act, 15 U.S.C. § 78u-2, and under Section 203(i) of the Advisers Act, 15 U.S.C. § 80b-3(i). The agency determined that Geman's role in the firm's "fraudulent disclosure to its customers" merited a "Third Tier" fine of $100,000, and that "Second Tier" fines of $50,000 were appropriate for his conduct in connection with the firm's record keeping violations and its violation of Exchange Act Rule 10b-10(a)(8)(i)(A). The terminology of Second Tier and Third Tier comes from the Exchange Act. A Third Tier penalty of up to $100,000 (for a natural person) for each act or omission is authorized if –

> (A) the act or omission . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
> (B) such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or

resulted in substantial pecuniary gain to the person who committed the act or omission.

15 U.S.C. § 78u-2(b)(3). A Second Tier penalty of up to $50,000 (for a natural person) is authorized when a violation "involves fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" without regard to whether substantial losses or the risk thereof or substantial gain has been shown.

Mr. Geman contends that the Commission abused its discretion in setting the penalties for his actions. He argues first that because he did nothing at all that was blameworthy, there should have been no discipline. This we must of course reject in light of our foregoing holdings.

Geman next contends that he was punished too severely. He raises a number of objections we will address briefly. First, with regard to the Third Tier penalty for what the SEC termed his role in the firm's "fraudulent disclosure to its customers," Geman repeats arguments that we have already rejected. To his assertion that there was no duty to disclose the firm's profit motive underlying its adoption of principal trading, we have answered that there was affirmative misrepresentation as to the reason for the change, not a mere failure to disclose that the motive was to make money, and we have held that it was fraudulent and in breach of the firm's fiduciary duties not to disclose that the firm's decision was based on its belief that, in many cases, it could get a better price than the customer was getting within minutes or hours of filling the customer's order.

Moreover, Geman says that there was no duty to disclose that the firm's trading as

a principal would deny the customers the opportunity for better terms through the use of the price improvement mechanism available on some trades through the wholesale dealers by which the firm executed its trades. Geman again relies on the lack of evidence that any specific customer was deprived of this opportunity on any specific trade, and he terms it a "non-existent" opportunity.

We have held, however, that when the price improvement opportunity was available on a significant portion of the firm's business, about eight per cent of all trades, the firm's fiduciary duties to its customers prohibited the firm from taking advantage of this to the detriment of its customers, absent specific consent which, of course, was never solicited since the firm made no disclosure at all regarding this. In light of the fiduciary duties owed, we have deferred to the SEC's conclusion that this omission was fraudulent. Geman further argues that the non-disclosures must have been material to support a holding of fraud, but we have no doubt that these facts would have been material to a reasonable investor.

Geman further contends that he had no intent to defraud. It is well settled, however, that recklessness is tantamount to intent. Geman assails the Commission for having, throughout the years, enforced a standard that, he maintains, has diluted the recklessness standard until it amounts to a mere negligence standard. We need not review decades of administrative decisions because we agree with the SEC that recklessness, not mere negligence, has been established here.

With regard to the Second Tier penalties, Geman again asserts his complete innocence, which assertion we have already rejected. Geman also argues that the SEC did not find reckless or deliberate misconduct on his part with regard to the firm's record keeping dereliction. To the contrary, the agency found that his conduct "was at the very least reckless . . . ." SEC Opinion at 34.

*Conclusion*

In sum, we hold that the SEC's conclusions are consistent with controlling precedents, its findings are not clearly erroneous, and we find no abuse of discretion in the penalties imposed. Accordingly the order of the Commission is

**AFFIRMED.**