# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 5, 2006         Decided March 30, 2007

No. 04-1242

FINANCIAL PLANNING ASSOCIATION,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with
No. 05-1145

———

On Petitions for Review of an Order of the
Securities and Exchange Commission

———

*Merril Hirsh* argued the cause for petitioner. With him on the briefs was *Jonathan A. Cohen.*

*Rachel M. Weintraub* and *Mercer E. Bullard* were on the brief for *amici curiae* Consumer Federal of America and Fund Democracy, Inc. in support of petitioner.

*Debra G. Speyer* was on the brief for *amicus curiae* Public Investors Arbitration Bar Association in support of petitioner.

*Rex A. Staples* was on the brief for *amicus curiae* North American Securities Administrators Association, Inc. in support of petitioner.

*Rada L. Potts*, Senior Litigation Counsel, Securities & Exchange Commission, argued the cause for respondent. With her on the brief were *Brian G. Cartwright*, General Counsel, *Jacob H. Stillman*, Solicitor, *Michael A. Conley*, Special Counsel, and *Jeffrey T. Tao*, Senior Counsel.

Before: ROGERS, GARLAND and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Dissenting opinion filed by *Circuit Judge* GARLAND.

ROGERS, *Circuit Judge*: Brokers and dealers are not subject to the requirements of the Investment Advisers Act ("IAA") where their investment advice is (1) "solely incidental to the conduct of [their] business as a broker or dealer," and (2) the broker or dealer "receives no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(C) (2000). The Securities and Exchange Commission, acting pursuant to § 202(a)(11)(F) and § 211(a) of the IAA, 15 U.S.C. §§ 80b-2(a)(11)(F)[1], 80b-11(a),

---

[1] In the wake of the Enron and WorldCom collapses, Congress enacted the Credit Rating Agency Reform Act of 2006 ("CRARA"), Pub. L. No. 109-291, 120 Stat. 1327, 1337 (2006), which included an amendment to the IAA to add a new exception to the definition of "investment adviser" in § 202(a)(11) for statistical rating organizations. CRARA § 4(b)(3), Pub. L. No. 109-291. Hence, subsection (F) is now found in 15 U.S.C. § 80b-2(a)(11)(G). References in this opinion are to the IAA prior to this 2006 amendment.

promulgated a final rule exempting broker-dealers[2] from the IAA when they receive "special compensation therefor." *See* "Certain Broker-Dealers Deemed Not to be Investment Advisers," 70 Fed. Reg. 20,424 (Apr. 19, 2005). The Financial Planning Association ("FPA") petitions for review of the final rule on the ground that the SEC has exceeded its authority. We agree, and we therefore grant the petition and vacate the final rule.

**I.**

The IAA was enacted by Congress as one title of a bill "to provide for the registration and regulation of investment companies and investment advisers." Pub. L. No. 76-768, tit. II, 54 Stat. 847 (1940). The other title was the Investment Company Act ("ICA"). Pub. L. No. 76-768, tit. I, 54 Stat. 789 (1940). These were the last in a series of congressional enactments designed to eliminate certain abuses in the securities industry that contributed to the stock market crash of 1929 and the depression of the 1930s. Congress had previously enacted the Securities Act of 1933, the Securities Exchange Act of 1934 (hereinafter "the Exchange Act"), the Public Utility Holding Company Act of 1935, and the Trust Indenture Act of 1939.

"A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). The IAA arose from a consensus between industry and the SEC "that

---

[2] We refer to brokers and dealers as "broker-dealers" because their different roles are irrelevant for purposes of this appeal. *See* IAA, 15 U.S.C. §§ 80b-2(a)(3), (a)(7); Securities Exchange Act, 15 U.S.C. §§ 78c(a)(4) (broker) , (a)(5) (dealer).

investment advisers could not 'completely perform their basic function – furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments – unless all conflicts of interest between the investment counsel and the client were removed.'" *Id.* at 187 (citation omitted). According to the Committee Reports, "[t]he essential purpose of [the IAA] ... [was] to protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard the honest investment adviser against the stigma of the activities of these individuals by making fraudulent practices by investment advisers unlawful." H.R. Rep. No. 76-2639, at 28 (1940).

> Virtually no limitations or restrictions exist with respect to the honesty and integrity of individuals who may solicit funds to be controlled, managed, and supervised.... Individuals assuming to act as investment advisers at present can enter profit-sharing contracts which are nothing more than 'heads I win, tails you lose' arrangements. Contracts with investment advisers which are of a personal nature may be assigned and the control of funds of investors may be transferred to others without the knowledge or consent of the client."

S. Rep. No. 76-1775, at 21-22 (1940).

Under the IAA, investment advisers are required, among other things, to register and to maintain records, 15 U.S.C. § 80b-3(c) & (e); to limit the type of contracts they enter, *id.* § 80b-5; and not to engage in certain types of deceptive and fraudulent transactions, *id.* § 80b-6. Congress has amended the

IAA on several occasions,[3] *see* VII Louis Loss & Joel Seligman, *Securities Regulation* 3314-15 (3d ed. 2003), but the provisions at issue in this appeal have remained, in relevant part, unchanged.

In § 202(a)(11) of the IAA, Congress broadly defined "investment adviser" as

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities ...."

15 U.S.C. § 80b-2(a)(11). Carving out six exemptions from this broad definition, Congress determined that an "investment adviser" did not include:

> (A) a bank, or any bank holding company as defined in the Bank Holding Company Act of 1956 which is not an investment company, except that the term "investment adviser" includes any bank or bank holding company to the extent that such bank or bank holding company serves or acts as an investment adviser to a registered investment company, but if, in the case of a bank, such services or actions are performed through a separately identifiable department or division, the department or division, and not the

---

[3] *See, e.g.*, Pub. L. No. 86-507, 74 Stat. 201 (1960); Pub. L. No. 86-624, 74 Stat. 412 (1960); Pub. L. No. 86-750, 74 Stat. 885 (1960); Pub. L. No. 91-547, 84 Stat. 1430, 1433 (1970) (adding § 206A); Pub. L. No. 94-29, 89 Stat. 163 (1975).

bank itself, shall be deemed to be the investment adviser;

(B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession;

**(C) any broker or dealer [1] whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and [2] who receives no special compensation therefor;**

(D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation;

(E) any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 3(a)(12) of the Securities Exchange Act of 1934, as exempted securities for the purposes of that Act; or

**(F) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.**

15 U.S.C. § 80b-2(a)(11) (emphasis added). Subsections (C) and (F) are at issue in this appeal.

Before enactment of the IAA, broker-dealers and others who offered investment advice received two general forms of compensation. Some charged only traditional commissions (earning a certain amount for each securities transaction completed). Others charged a separate advice fee (often a certain percentage of the customer's assets under advisement or supervision). *See* 11 Fed. Reg. 10,996 (Sept. 27, 1946). The Committee Reports recognized that the statutory exemption for broker-dealers reflected this distinction; the Reports explained that the term "investment adviser" was "so defined as specifically to exclude ... brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions)." S. Rep. No. 76-1775, at 22; H. R. Rep. No. 76-2639, at 28.

The final rule took a different approach. After determining in 1999 that certain new forms of fee-contracting adopted by broker-dealers were "not ... fundamentally different from traditional brokerage programs," the SEC proposed a rule very similar to the final rule, *see* Notice of Proposed Rulemaking, 64 Fed. Reg. 61,228 (Nov. 10, 1999) ("1999 NOPR"), stating it would act as if it had already issued the rule, *id.* at 61,227. In adopting the temporary rule, pursuant to subsection (F) and its general rulemaking authority under IAA § 211(a), the SEC exempted a new group of broker-dealers from the IAA. 64 Fed. Reg. 61,226 (Nov. 10, 1999). After re-proposing the rule in January 2005, again pursuant to its authority under subsection (F) and § 211(a), the SEC adopted a slightly modified final rule on April 12, 2005, codified at 17 C.F.R. § 275.202(a)(11)-1. 70 Fed. Reg. 20,424, 453-54.

The final rule provides, generally, in <u>Paragraph (a)(1)</u>, on "fee-based programs," that a broker-dealer who (1) receives special compensation will not be deemed an investment adviser if (2) any advice provided is solely incidental to brokerage

services provided on a customer's account and (3) specific disclosure is made to the customer.[4]  In Paragraph (a)(2), on discount brokerage programs, a broker-dealer will not be deemed to have received special compensation merely because it charges one customer more or less for brokerage services than it charges another customer.  Paragraph (b) lists three non-exclusive circumstances in which advisory services, for which special compensation is received under paragraph (a)(1), would not be performed "solely incidental to" brokerage:  when (1) a separate fee or contract exists for advice; (2) a customer receives certain financial planning services; and, (3) generally, a broker-dealer has investment discretion over a client's account.  Paragraph (c) states a "special rule" that broker-dealers registered under the Exchange Act are investment advisers only for those accounts for which they receive compensation that subjects them to the IAA.  Paragraph (d) defines the term "investment discretion," which appears in paragraphs (a)(1) and (b)(3), to have the same meaning as § 3(a)(35) of the Exchange Act, 15 U.S.C. § 78c(a)(35), except for "discretion granted by a customer on a temporary or limited basis."

---

[4]  The required disclosure consists of the following statement:

> Your account is a brokerage account and not an advisory account.  Our interests may not always be the same as yours.  Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligations to disclose conflicts of interest and to act in your best interest.  We are paid both by you and, sometimes, by people who compensate us based on what you buy.  Therefore, our profits, and our salespersons' compensation, may vary by product and over time.

Section (a)(1)(ii), 70 Fed. Reg. 20,454.

The FPA petitions for review, challenging the SEC's authority to promulgate the final rule.[5] We first address the threshold issue presented by the SEC's challenge to FPA's standing.

## II.

Article III standing is a fundamental prerequisite to any exercise of the court's jurisdiction, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and requires, at the "irreducible constitutional minimum," *id.*, a showing that the litigant has suffered a concrete and particularized injury that is actual or imminent, traceable to the challenged act, and redressable by the court. *See Allen v. Wright*, 468 U.S. 737, 751 (1984); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37-38, 41-42 (1976). A petitioner must support each element of its claim to standing "by affidavit or other evidence." *Defenders of Wildlife*, 504 U.S. at 561; *see Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). The SEC maintains that the FPA fails to show injury-in-fact because FPA's assertions of injury from the final rule's dual standard are conclusory.

The standard for representational standing is well-established:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

---

[5] The FPA initially filed a petition in 2004 for review of the 1999 temporary rule. *See* 69 Fed. Reg. 51,620 n.4 (Aug. 20, 2004). After the SEC promulgated the final rule on April 12, 2005, FPA again petitioned for review. The court consolidated the petitions by Order of May 11, 2005.

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The FPA meets this test.

The court has "repeatedly recognized that parties 'suffer constitutional injury in fact when agencies ... allow increased competition' against them." *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (citation omitted). The FPA is a non-profit organization with over 27,000 members that exists to advance the financial planning profession. *See* Decl. of Daniel Moisand, President of the FPA, ¶¶ 1, 2, Petitioner's Br. App. 1. The final rule creates a dual standard for the provision of investment advice. First, there are investment advisers who are covered by the IAA; many FPA members are investment advisers, and must comply with the IAA. *See* FPA Comment Letter of Feb. 7, 2005 n.1. Second, there is a new group of broker-dealers who are exempted from the IAA even though their activities do not conform to the two-pronged requirements of subsection (C). The two groups compete for customers, and under the final rule one of them (including FPA members) must continue to comply with the IAA, while the other one (the broker-dealers in the new, exempt category) need not.

Additionally, contrary to the SEC's view, the FPA also has prudential standing. Its members are within the IAA's zone of interest, *see Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), because one of Congress's purposes in enacting the IAA was to protect the ability of "bona fide" investment advisers to compete on a level regulatory playing field with those advisers who did not fully disclose their conflicts of interest, *see Capital*

*Gains*, 375 U.S. at 191 (1963).

Accordingly, we hold that the FPA has standing to bring its petition.

**III.**

The FPA contends that when Congress enacted the IAA, Congress identified in subsection (C) the group of broker-dealers it intended to exempt, and that subsection (F) was only intended to allow the SEC to exempt new groups from the IAA, not to expand the groups that Congress specifically addressed. The resolution of the FPA's challenge thus turns on whether the SEC is authorized under § 202(a)(11)(F) or § 211(a) to except from IAA coverage an additional group of broker-dealers beyond the broker-dealers exempted by Congress in subsection (C), 15 U.S.C. § 80b-2(a)(11)(C). Subsection (F) of § 202(a)(11) authorizes the SEC to except from the IAA "such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order." 15 U.S.C. § 80b-2(a)(11)(F). As such, we review the SEC's exercise of its authority pursuant to subsection (F) under the familiar two-step analysis of *Chevron, USA, Inc. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 842-43 (1984). Under step one, the court must determine whether Congress has directly spoken to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Under step two, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In reviewing an agency's interpretation of its authority under a statute it administers, the court will uphold that interpretation as long as it is a reasonable interpretation of the statute. *See*

*Village of Bergen v. FERC*, 33 F.3d 1385, 1389 (D.C. Cir. 1994).

Applying the "traditional tools of statutory construction," *see Chevron*, 467 U.S. at 843 n.9, the court looks to the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve. *See PDK Labs. Inc. v. DEA,* 362 F.3d 786, 796 (D.C. Cir. 2004); *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002). All four elements demonstrate that the SEC has exceeded its authority in promulgating the rule under § 202(a)(11)(F) because Congress has addressed the precise issue at hand.

Section 202(a)(11) lists exemptions (A)-(E) from the broad definition of "investment adviser" for several classes of persons – including, for example, lawyers, accountants, and others whose advice is "solely incidental" to their regular business; and publishers of newsletters that circulate widely and do not give individually-tailored financial advice. Among the IAA exemptions is subsection (C)'s exemption for "*any* broker or dealer whose performance of such [investment advisory] services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." (Emphasis added). Beyond the listed exemptions, subsection (F) authorizes the SEC to exempt from the IAA "such *other* persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order." (Emphasis added).

In the final rule, the SEC purports to use its authority under subsection (F) to broaden the exemption for broker-dealers provided under subsection (C). The rule is inconsistent with the IAA, however, because it fails to meet either of the two requirements for an exemption under subsection (F). First, the legislative "intent" does not support an exemption for broker-

dealers broader than the exemption set forth in the text of subsection (C); therefore, the final rule does not meet the statutory requirement that exemptions under subsection (F) be consistent with the "intent" of paragraph 11 of section 202(a). Second, because broker-dealers are already expressly addressed in subsection (C), they are not "other persons" under subsection (F); therefore the SEC cannot use its authority under subsection (F) to establish new, broader exemptions for broker-dealers.

The final rule's exemption for broker-dealers is broader than the statutory exemption for broker-dealers under subsection (C). Although the SEC maintains that the intent of paragraph 11 is to exempt broker-dealers who receive special compensation for investment advice, the plain text of subsection (C) exempts only broker-dealers who do not receive special compensation for investment advice. The word "any" is usually understood to be all inclusive. *See New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006). As "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters,'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)), the terms of the IAA establish the precise conditions under which broker-dealers are exempt from the IAA. "To read out of a statutory provision a clause setting forth a specific condition or trigger to the provision's applicability is ... an entirely unacceptable method of construing statutes." *Natural Res. Def. Council v. EPA*, 822 F.2d 104, 113 (D.C. Cir. 1987).

No other indicators of congressional intent support the SEC's interpretation of its authority under subsection (F). The relevant language in the committee reports suggests that Congress deliberately drafted the exemption in subsection (C) to apply as written. Those reports stated that the "term

'investment adviser' is so defined as specifically to exclude ... brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions)." S. Rep. No. 76-1775, at 22 (emphasis added); *see also* H.R. Rep. No. 76-2639, at 28. By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.

The text of subsection (F) confirms this conclusion by the limiting the SEC's exemption authorization to "other persons." We agree with the FPA that when Congress enacted the IAA, Congress identified the specific classes of persons it intended to exempt. As to broker-dealers, subsection (C) applied to "*any* broker or dealer." Congress, through the use of contrasting text in subsection (F), signaled that it only authorized the SEC to exempt "*other* persons" when consistent with the intent of the paragraph, and thus only when doing so would not override Congress's determination of the appropriate persons to be exempted from the IAA's requirements.

As the FPA points out, the word "other" connotes "existing besides, or distinct from, that already mentioned or implied." II *The Shorter Oxford English Dictionary* 1391 (2d ed. 1936, republished 1939). *See Key v. Allstate Ins. Co.,* 90 F.3d 1546, 1550 (11th Cir. 1996) (citing *The American Heritage Dictionary* 931 (1981)). There is nothing to suggest that Congress did not intend the words "any" or "other" to have their "ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). So understood, courts have hesitated to allow parties to use language structurally similar to the "other persons" clause in subsection (F) to redefine or otherwise avoid specific requirements in existing statutory exceptions. In *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 n.11 (1988),

for example, the Supreme Court noted that where Federal Rule of Civil Procedure 60(b) contained five explicit grounds for relief, and one non-specific "any *other* reason" clause, (emphasis added) the structure of the clauses suggested that the final clause could not be used to elude or enlarge the first five – that "clause (6) and clauses (1) through (5) are *mutually exclusive*." (emphasis added). *Accord Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993); *Hesling v. CSX Transp. Inc.*, 396 F.3d 632, 643 (5th Cir. 2005); *United States v. Erdoss*, 440 F.2d 1221, 1223 (2d Cir. 1971). Similarly, in *Am. Bankers Ass'n v. SEC*, this court explained that:

> A universal clause preceding every definition in the statute, which states only "unless the context otherwise requires," cannot provide the authority for one of the agencies whose jurisdictional boundaries are defined in the statute to alter by administrative regulation those very jurisdictional boundaries. To suggest otherwise is to sanction administrative autonomy beyond the control of either Congress or the courts.

804 F.2d 739, 754 (D.C. Cir. 1986). Our dissenting colleague attempts to distinguish these two cases as limited to situations in which one agency seeks to redraw the jurisdictional boundaries of another agency. *See* Dissenting Op. at 7-9. That interpretation, however, ignores the underlying principle in each case: where the statutory text is clear, an agency may not use general clauses to redefine the jurisdictional boundaries set by the statute.

Just as the text and structure of paragraph of 202(a)(11) make it evident that Congress intended to define "investment adviser" broadly and create only a precise exemption for broker-dealers, so does a consideration of the problems Congress

sought to address in enacting the IAA. A comprehensive study conducted by the SEC pursuant to the Public Utility Holding Company Act of 1935 indicated that "many investment counsel have 'strayed a great distance from that professed function' of furnishing disinterested, personalized, continuous supervision of investments." Securities and Exchange Commission, *Investment Counsel, Investment Management, Investment Supervisory and Investment Advisory Services*, at 25 (1939) (quoting testimony of brokerage executive James N. White, of Scudder, Stevens & Clark). Floor debate on the IAA called attention to the fact that while this study was being conducted investment trusts and investment companies had perpetrated "some of the most flagrant abuses and grossest violations of fiduciary duty to investors." 86 Cong. Rec. 2844 (daily ed. Mar. 14, 1940) (statement of Sen. Wagner). Congress reiterated throughout its proceedings an intention to protect investors and bona fide investment advisers.[6]

The overall statutory scheme of the IAA addresses the problems identified to Congress in two principal ways: First, by establishing a federal fiduciary standard to govern the conduct of investment advisers, broadly defined, *see Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 17 (1979), and second, by requiring full disclosure of all conflicts of interest. As the Supreme Court noted, Congress's "broad proscription against 'any ... practice ... which operates ... as a fraud or deceit upon any client or prospective client' remained in the bill from beginning to end." *Capital Gains*, 375 U.S. at 191.

[T]he Committee Reports indicate a desire to ...

---

[6] *See, e.g.*, 86 Cong. Rec. S2844-45, 2847 (daily ed. Mar. 14, 1940); 86 Cong Rec. S8843 (daily ed. June 21, 1940); 86 Cong. Rec. H9807, 9809, 9815-16 (daily ed. Aug. 1, 1940); 86 Cong. Rec. S10077 (daily ed. Aug. 8, 1940).

> eliminate conflicts of interest between the investment adviser and the clients as safeguards both to 'unsophisticated investors' and to 'bona fide investment counsel.' The [IAA] thus reflects a ... congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested.

*Id*. at 191-92. This statutory scheme is inconsistent with a construction of the SEC's authority under subsection (F) that would enable persons Congress determined should be subject to the IAA to escape its restrictions.

In an attempt to overcome the plain language of the statute, the SEC asserts that Congress was also concerned about the regulation of broker-dealers under both the IAA and Exchange Act, and that such concern was reflected in the "intent" of the paragraph. *See* 70 Fed. Reg. 20,430; *see also* 64 Fed. Reg. 61,228. The SEC points to no convincing evidence that supports these assertions. At the time Congress enacted the IAA in 1940, broker-dealers were already regulated under the Exchange Act. In the IAA, Congress expressly acknowledged that the broker-dealers it covered could also be subject to other regulation. IAA § 208(b), 15 U.S.C. § 80b-8(b). The IAA's essential purpose was to "protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard the honest investment adviser against the stigma of the activities of these individuals by making fraudulent practices by investment advisers unlawful." H.R. Rep. No. 76-2639 at 28; *see also id.* at 21. As the FPA emphasizes, there is nothing in the committee reports to suggest that Congress was particularly concerned about the regulatory burdens on broker-dealers.

While the SEC's failure to respect the unambiguous textual

limitations marked by the phrase "intent of this paragraph" and "other persons" is fatal to the final rule, an additional weakness exists in the SEC's interpretation: It flouts six decades of consistent SEC understanding of its authority under subsection (F). *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-82 (1969).[7] Subsection (F) is not a catch-all that

---

[7] Very shortly after enactment of the IAA, the SEC advised that any charges directly related to the giving of investment advice would be special compensation. On October 28, 1940, the SEC General Counsel issued an opinion stating:

> Clause (C) of section 202 (a) (11) amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business, and that it would be inappropriate to bring them within the scope of the Investment Advisers Act merely because of this aspect of their business. On the other hand, that portion of clause (C) which refers to "special compensation" amounts to an equally clear recognition that a broker or dealer who is specially compensated for the rendition of advice should be considered an investment adviser and not be excluded from the purview of the Act merely because he is also engaged in effecting market transactions in securities.

11 Fed. Reg. 10,996 (Sept. 27, 1946) (reprinting SEC General Counsel opinion letter of October 28, 1940). Thus, any charges "directly related to the giving of advice" would be special compensation. *Id.*

authorizes the SEC to rewrite the statute. Rather, as subsection (F)'s terms provide, the authority conferred must be exercised consistent with the "intent of this paragraph" and apply to "other persons." The SEC cannot point to any instance between the 1940 enactment of the IAA and the commencement of the rulemaking proceedings that resulted in the final rule in 2005, when it attempted to invoke subsection (F) to alter or rewrite the exemptions for persons qualifying for exemptions under subsections (A)-(E). Rather, the SEC has historically invoked subsection (F) to exempt persons not otherwise addressed in the five exemptions established by Congress: For example, the adviser to a family trust who was otherwise subject to fiduciary duties, Oral Arg. Tape at 39:20-43:24; or new groups, such as

---

This contemporary interpretation was reflected as well when the SEC addressed two-tiered pricing arrangements (including a discounted fee arrangement) in 1978:

> [I]f a broker-dealer has in effect, either formally or informally, two general schedules of fees available to a customer, the lower without investment advice and the higher with investment advice[,] and the difference is primarily attributable to this factor . . . the [SEC] would regard the extra charge as "special compensation" for investment advice.

43 Fed. Reg. 19,224, 19,226 (May 4, 1978). The SEC made clear at the time that "[t]his would be the case even in a situation, currently nonexistent, in which a current 'full service' firm implements a 'discount' or 'execution-only' service." *Id.*; *see also Townsend & Assocs., Inc.*, SEC No-Action Letter, 1994 SEC No-Act. LEXIS 739 (Sept. 21, 1994)*; Am. Capital Fin. Servs., Inc.*, SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2209 (Apr. 29, 1985).

thrift institutions acting in a fiduciary capacity, 69 Fed. Reg. 25,777-90 (May 7, 2004), and World Bank instrumentalities that provide advice only to sovereigns, *In re Int'l Bank for Reconstr. & Dev.,* 2001 SEC LEXIS 1782 (Sept. 4, 2001). As the SEC's own actions for the last 65 years suggest, subsection (F) serves the clear purpose of authorizing the SEC to address persons or classes involving situations that Congress had not foreseen in the statutory text – not to broaden the exemptions of the classes of persons (such as broker-dealers) Congress had expressly addressed.

The SEC unconvincingly attempts to defend its expansive interpretation of subsection (F) by likening it to section 6(c) of the ICA, 15 U.S.C. § 80a-6(c). Section 6(c) of the ICA empowers the SEC to grant exemptions from the ICA, or any rule or regulation adopted under it, "if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions" of the ICA. This court has noted that the SEC "has exercised this authority to exempt persons not within the intent of the [ICA] and generally to adjust its provisions to take account of special situations not foreseen when the [ICA] was drafted." *NASD v. SEC*, 420 F.2d 83, 92 (D.C. Cir. 1969), vacated on other grounds, *Investment Co. Inst. v. Camp*, 401 U.S. 617 (1971). Reliance on *NASD* does not advance the SEC's position as the plain text of the ICA is far broader than that of IAA subsection (F). The ICA expressly refers to the SEC's view of "the public interest" as a basis for new exemptions. "[W]e assume that in drafting ... legislation, Congress said what it meant." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). Although Congress amended the IAA in 1970, *see supra* n.3, and repeated the same ICA language highlighted in *NASD* in § 206A of the IAA, 15 U.S.C. § 80b-6a, the SEC disavows any reliance on § 206A in promulgating the final rule, *see* 70 Fed. Reg. 20,453; Respondent's Br. at 27 n.10,

and thus the court has no occasion to express an opinion on the SEC's authority under it, *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). But the broader language found in § 206A supports the conclusion that subsection (F) must be read more narrowly. *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001); *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994).

In light of the context in which Congress drafted subsections (C) and (F), we conclude that, as indicated by the structure of § 202(a)(11) and the problems that Congress addressed in the IAA, as well as the other indicators of Congress's intent, under *Chevron* step one the text of subsections (C) and (F) is unambiguous, and that, therefore, the SEC has exceeded its authority in promulgating the final rule. Our dissenting colleague's analysis fails to confront two realities of statutory construction. First, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Congress has used words having ordinary meaning – "*any* broker or dealer" in subsection (C) and "*other* persons" in subsection (F) – and a familiar structure to express its "intent" in addressing problems identified by the industry and the SEC. Second, the absence of a statutory definition of "intent of this paragraph" and "other persons" does not necessarily render their meaning ambiguous. *See Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). Again, the meaning of the text is defined by its context as set forth in the normal meaning of the words, the structure of paragraph 11, and the problems Congress sought to address in the IAA. Because the court's duty is to give meaning to each word of a statute, the court cannot properly treat one authorization, under subsection (F), as duplicative of another authorization, under Section 206A. *See supra* at 20; Dissenting Op. at 10. Consequently, section 202(a)(11)(F) does not lend itself to alternative meanings; to conclude otherwise would undermine Congress's purpose in enacting the IAA —  to

protect consumers and honest investment advisers and to establish fiduciary standards and require full disclosure of all conflicts of interests of "investment advisers," broadly defined. The SEC's suggestion that "new" broker-dealer marketing developments fall within the scope of its authority under subsection (F) ignores its own contemporaneous understanding of Congressional intent to capture such developments. *See supra* at 17 and note 7. Although an agency may change its interpretation of an ambiguous statute, all elements of the traditional tools of statutory interpretation confound the SEC's effort to walk away from its long-settled view of the limits of its authority under subsection (F) and our dissenting colleague's attempt to find an alternative meaning at this late date.

The SEC's invocation of its general rulemaking authority under IAA section 211(a),[8] is likewise to no avail because it suggests no intention by Congress that the SEC could ignore either of the two requirements in subsection (C) for broker-

---

[8] Section 211(a) provides:

> The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as are necessary or appropriate to the exercise of the functions and powers conferred upon the Commission elsewhere in this subchapter. For the purposes of its rules or regulations the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters.

15 U.S.C. § 80b–11(a).

dealers to be exempt from the IAA. *See Am. Bankers*, 804 F.2d at 755. Paraphrasing an apt observation, while, in the SEC's view, "[t]he statute may be imperfect, ... the [SEC] has no power to correct flaws that it perceives in the statute it is empowered to administer. Its [subsection (F) authority and its] rulemaking power[s] [are] limited to adopting regulations to carry into effect the will of Congress as expressed in the statute." *Bd. of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986).

Accordingly, we grant the petition and vacate the final rule. *See North Carolina v. Fed. Energy Regulatory Comm'n*, 730 F.2d 790, 795-96 (D.C. Cir. 1984); *cf. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). The final rule does not contain a severability clause; nor does the SEC suggest it is severable. Paragraph (b) is expressly tied to paragraph (a). Although, absent (a) or (b), paragraph (c) merely states the current law, the SEC identifies paragraph (c) as one of "three separate, yet related, parts" of the final rule. Respondent's Br. at 11, 13. Paragraph (d) defines a term used in paragraphs (a) and (b). The SEC release to the final rule states that paragraph (d) institutes a policy change based on its interpretation of subsection (F), *see* 70 Fed. Reg.20,439-440, but otherwise identifies paragraph (d) in the release as part and parcel of the final rule, *see, e.g., id.* at 20,424.

GARLAND, *Circuit Judge*, dissenting:

The Investment Advisers Act contains five specific exceptions, and further authorizes the SEC to exempt "such other persons not within the intent of this paragraph, as the Commission may designate by rules." 15 U.S.C. § 80b-2(a)(11). Unlike my colleagues, I cannot derive an unambiguous meaning from the terms "such other persons" and "within the intent of this paragraph." As required by *Chevron*, I would therefore defer to the SEC's reasonable interpretation of the statute it administers and uphold the Commission's fee-based brokerage rule.

I

The Investment Advisers Act (IAA) imposes a series of requirements on "investment advisers." *See* 15 U.S.C. §§ 80b-3 to -6. Paragraph 11 of section 202(a) of the Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," unless that person comes within one of six exceptions. *Id.* § 80b-2(a)(11).[*] The first five exceptions include, inter alia, certain banks and bank holding companies, certain lawyers and accountants, and -- most relevant here -- certain brokers and dealers. The exception relating to broker-dealers -- subsection (C) -- exempts:

> any broker or dealer whose performance of [advisory] services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor.

---

[*]Congress added a seventh exception in 2006. My citations, like the court's, are to the pre-amendment statute.

*Id.* § 80b-2(a)(11)(C). The SEC has construed "special compensation" to mean any compensation other than brokerage commissions (or dealers' "mark-ups" or "mark-downs"). *See* Certain Broker-Dealers Deemed Not To Be Investment Advisers, 70 Fed. Reg. 20,424, 20,425 & n.10 (Apr. 19, 2005) [hereinafter Certain Broker-Dealers]. Hence, a broker-dealer who receives any kind of compensation other than commissions does not come within the subsection (C) exception, even if he, too, provides advice solely as an incident to his business as a broker-dealer. *See id.* at 20,425.

In addition to the five specific exceptions, the IAA's definition of covered investment advisers includes a sixth exception -- subsection (F) -- which reads as follows:

> such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.

15 U.S.C. § 80b-2(a)(11)(F). That exception is the crux of this case. In the final rule currently under attack, the SEC exercised its authority under subsection (F) to create an exception for broker-dealers whose provision of advice is also solely incidental to their brokerage services, but who receive a particular kind of non-commission compensation. These broker-dealers -- a group that did not exist when the IAA was passed in 1940 -- charge either a fixed fee or a fee based on the amount of assets in the customer's account. In return, they provide the customer with a traditional package of brokerage services that includes investment advice, execution, arranging for delivery and payment, and custodial and recordkeeping services. Certain Broker-Dealers, 70 Fed. Reg. at 20,425. Because these broker-dealers receive fee-based compensation rather than commissions, they receive "special compensation" within the

meaning of subsection (C) and hence are not covered by that exception.  *See id.*

As the court states, the question before us is whether subsection (F) gives the SEC the authority to "except from IAA coverage an additional group of broker-dealers beyond the broker-dealers exempted by Congress in subsection (C)."  Court Op. at 11.  The SEC believes that it does.  In the Commission's view, although these broker-dealers receive "special compensation" in a technical sense, they provide investment advice in the same manner as those who are exempt under subsection (C), and exempting them would thus serve the same purpose.  *See infra* Part III.

Under the first step of *Chevron* analysis, if the terms of subsection (F) unambiguously preclude the SEC's interpretation, we must reject it.  *See Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984).  If the terms are ambiguous, however, we must proceed to *Chevron*'s second step and defer to the SEC's interpretation if it is reasonable.  *See id.*; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

II

The court begins and ends its analysis at *Chevron* step one, concluding that the SEC unambiguously lacks authority under subsection (F) to exempt any broker-dealers beyond those specified in subsection (C).  Court Op. at 21.  The court reaches this conclusion based on its examination of the subsection (F) terms "such other persons" and "within the intent of this paragraph."   I fail to appreciate the clarity of either term. Indeed, apart from the inherent ambiguity of the words themselves, clarity is particularly elusive because subsection (F)'s final clause -- "as the Commission may designate by rules"

4

-- expressly authorizes the SEC to determine the intent of the paragraph and designate further exceptions by regulation. As the Supreme Court instructed in *Chevron*, where "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation[,] [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *see Am. Council on Educ. v. FCC*, 451 F.3d 226, 232 (D.C. Cir. 2006).

A

Like my colleagues, I begin with the term "within the intent of this paragraph." Under *Chevron*, a statutory term is unambiguous only if Congress has "directly spoken to the precise question at issue." 467 U.S. at 842-43. The court is obviously correct in stating that "the plain text *of subsection (C)* exempts only broker-dealers who do not receive special compensation for investment advice" -- that is, broker-dealers who do not receive compensation other than commissions. Court Op. at 13 (emphasis added). But that is not the precise question before us. That question is whether Congress intended *subsection (F)* to permit the SEC to exempt broker-dealers beyond those already exempt under subsection (C).

The court cannot point to any words in paragraph 11, or in any other paragraph of the Act, that suggest a negative answer to that question -- or that explain what Congress intended with respect to that question at all. Instead, the court appears to rely on a version of the *expressio unius* canon -- the principle that the mention of one thing implies the exclusion of another -- by reasoning that the exception for some broker-dealers in subsection (C) means that coverage of all other broker-dealers must be "within the intent of" paragraph 11. But this court has repeatedly held that *expressio unius* is "an especially feeble

helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1343 (D.C. Cir. 1999) (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)) (internal quotation marks omitted); *see Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) ("[T]he *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved the issue."). The canon's negative inference is particularly implausible where -- as in subsection (F) -- Congress has explicitly authorized additional exceptions beyond those specified in the statute.

Turning from the statutory text to the legislative history, the court quotes a committee report stating that the "'term "investment adviser" is so defined as specifically to exclude . . . brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions).'" Court Op. at 14 (quoting S. REP. NO. 76-1775, at 22 (1940)) (emphasis added by the court); *see also* H.R. REP. NO. 76-2639, at 28 (1940). This quotation, however, has the same problem identified above. The committee was referring only to the specific exclusion provided by subsection (C), and not to the further exclusions permitted by subsection (F). That is made clear by the sentence that follows the one quoted by the court: "*In addition*, the Commission is authorized by rules and regulations or order, to make certain *further* exceptions according to prescribed statutory standards." S. REP. NO. 76-1775, at 22 (emphasis added); *see also* H.R. REP. NO. 76-2639, at 28. There is nothing in the committee report that explains Congress' intentions with respect to those "further exceptions."

6

B

The court also perceives clarity in the subsection (F) term "such other persons." According to the court, "other persons" excludes any person who is a member of one of the broad categories referenced in paragraph 11's five specific exceptions. Because some broker-dealers are referenced in subsection (C), the court concludes that the subset of broker-dealers covered by the fee-based brokerage rule cannot constitute "other persons" within the meaning of subsection (F). *See* Court Op. at 14-15. The SEC, by contrast, contends that "other persons" excludes only those persons who actually come within one of the five preceding exceptions. On the SEC's reading, the fee-based brokerage rule is a permissible exercise of the Commission's delegated authority because it exempts broker-dealers other than those exempted by subsection (C).

Because the IAA does not define "other persons," the court turns to the dictionary to find its meaning. There, the court learns that "the word 'other' connotes 'existing besides, or distinct from, that already mentioned or implied.'" *Id.* at 14 (quoting 2 THE SHORTER OXFORD ENGLISH DICTIONARY 1391 (2d ed. 1936, republished 1939)). But like the text and the legislative history, the dictionary fails to resolve the precise question at issue. It cannot tell us whether the persons "already mentioned" in subsection (C) are "any broker or dealer," as one might reasonably conclude if one looked only at the first four words of the subsection, or instead are "any broker or dealer whose performance of such services is solely incidental to the conduct of his business . . . and who receives no special compensation therefor," as one might reasonably conclude if one looked at *all* the words of the subsection. The SEC takes the latter approach, and neither the plain text nor the dictionary bars that construction. This should end the *Chevron* step one inquiry.

Turning away from the IAA altogether, the court next looks to judicial precedents construing two different provisions -- Federal Rule of Civil Procedure 60(b) and the Securities Exchange Act of 1934. These cases, however, shed no light on the IAA.

In *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1998), the Supreme Court interpreted Rule 60(b), which allows a court to grant relief from a final judgment for any of five sets of specific reasons (e.g., mistake), or -- under the Rule's sixth clause -- for "any other reason justifying relief." FED. R. CIV. P. 60(b). Although *Liljeberg* does state that "'clause (6) and clauses (1) through (5) are mutually exclusive,'" Court Op. at 15 (quoting *Liljeberg,* 486 U.S. at 864 n.11), the case is wholly inapposite. First, the Court was interpreting Rule 60(b) de novo, not reviewing an agency interpretation entitled to *Chevron* deference. At most, then, the Court's statement indicates what it regarded as the *best* interpretation of the phrase "any other reason," not what it saw as the only possible interpretation. Second, the reason the Court read Rule 60(b) as it did was that the rule contains a one-year statute of limitations for seeking relief under clause (1), while motions under clause (6) need only be brought within a "reasonable time." Hence, barring a party from basing a clause (6) claim on the same grounds specified in clause (1) was necessary "to prevent clause (6) from being used to circumvent the 1-year limitations period that applies to clause (1)." *Liljeberg*, 486 U.S. at 864 n.11. There is nothing similar in the structure of IAA paragraph 11. Finally, the reading of Rule 60(b)'s "any other reason" clause rejected by the Supreme Court is actually the inverse of the SEC's reading of subsection (F). The Court stated that "a party may 'not avail himself of the broad "any other reason" clause' . . . if his motion is based *on grounds specified* in clause (1)." *Id.* (emphasis added) (quoting *Klapprott v. United States*, 335 U.S. 601, 613 (1949)). That is,

a person who qualifies for relief under clause (1) cannot also obtain relief under clause (6). Here, by contrast, the SEC employed subsection (F)'s "such other persons" language to create an exception for persons who could *not* qualify for an exception under any of the preceding subsections.

This circuit's interpretation of the Securities Exchange Act in *American Bankers Association v. SEC*, 804 F.2d 739 (D.C. Cir. 1986), is likewise inapposite. There, the court declined to accord *Chevron* deference to an SEC interpretation because it concerned the allocation of jurisdiction between the SEC and other agencies. The Exchange Act expressly excludes "banks," which are regulated by the federal banking agencies, from the definitions of "brokers" and "dealers," which are regulated by the SEC. *See id.* at 743 (citing 15 U.S.C. § 78c(a)(4)-(5)). The Act also contains a definition of "banks." *See id.* at 744 (citing 15 U.S.C. § 78c(a)(6)). Although all of the Exchange Act's definitions are preceded by an "unless the context otherwise requires" clause, *American Bankers* rejected the SEC's effort to use that clause to redefine "banks" so as to subject some to SEC regulation. Such a "rote phrase," the court said, "cannot provide the authority for *one* of the agencies whose jurisdictional boundaries are defined in the statute to alter by administrative regulation those very jurisdictional boundaries." *Id.* at 754 (emphasis added). But there is no other agency in the picture in this case. Nor is the Exchange Act's narrow direction to look to "context" to avoid "absurd consequences," *id.* at 753, equivalent to subsection (F)'s express delegation of authority to the SEC to make further exceptions to the IAA. Indeed, *American Bankers* itself suggested that, had the Exchange Act contained such an "express delegation," the result in that case might well have been different. *Id.* at 749.

In short, these cases do not illustrate an "underlying principle" that resolves the interpretive question in this case.

Court Op. at 15. To the contrary, they merely tell us how courts have construed dissimilar language in dissimilar circumstances -- that is, in situations where, unlike here, *Chevron* deference is inappropriate. There is, therefore, nothing in the text or structure of paragraph 11 -- or in any judicial precedent -- that compels the statutory construction that the court has adopted.

C

Finally, the court seeks to buttress its arguments from text and structure with three more general considerations. First, it examines "the problems Congress sought to address in enacting the IAA." *Id.* at 16. That the first item the court turns to in that examination is a 1939 "comprehensive study conducted by the SEC," *id.*, should cast some doubt on whether the court is better equipped to interpret the study's import than the authoring agency. In any event, my colleagues learn little from this or any other aspect of the historical context beyond the fact that "[t]he IAA's essential purpose was to 'protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts.'" *Id.* at 17 (quoting H.R. REP. NO. 76-2639, at 28). There is no doubt that this accurately identifies the intent of Congress at a high level of generality. But it, too, fails to address the precise question at issue here -- the meaning of subsection (F). Nor should it come as any surprise that -- as discussed in Part III below -- the SEC neither disputes that the IAA's essential purpose was to protect the public from fraud and misrepresentation, nor believes that its fee-based brokerage rule would be a boon to unscrupulous tipsters and touts.

My colleagues contend that "an additional weakness exists in the SEC's interpretation" because it "flouts six decades of consistent SEC understanding of its authority under subsection (F)." *Id.* at 18. The only SEC opinions quoted for that proposition are two releases that refer only to subsection (C).

Neither mentions subsection (F) at all, and neither considers whether an exception for fee-based brokerage would be appropriate under that (or any other) subsection. *See id.* at 18 n.7 (citing 43 Fed. Reg. 19,224, 19,226 (May 4, 1978), and 11 Fed. Reg. 10,996 (Sept. 27, 1946) (republishing SEC General Counsel opinion letter of Oct. 28, 1940)).

But even if the SEC had changed its construction of subsection (F), "'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Brand X*, 545 U.S. at 981 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)). It is well-settled that "[a]n agency's interpretation of a statute is entitled to no less deference . . . simply because it has changed over time." *Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision*, 373 F.3d 1355, 1360 (D.C. Cir. 2004). Indeed, *Chevron* itself deferred to a changed agency interpretation. *See Chevron*, 467 U.S. at 863-64. As the Court said in *Brand X*, "[u]nexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act" -- an issue my colleagues do not address. 545 U.S. at 981. In any event, the SEC's construction is neither inconsistent nor, as discussed in Part III, unexplained.

Last, my colleagues state that "the broader language found in § 206A [of the IAA] supports the conclusion that subsection (F) must be read more narrowly." Court Op. at 21. Whether the exempting power delegated to the SEC under § 206A is in fact broader than that delegated by subsection (F) is unclear. *Compare* 15 U.S.C. § 80b-6a, *with id.* § 80b-2(a)(11)(F). But even if it were, the court does not explain how § 206A, which was not added to the IAA until 1970, can provide insights into the intent of the Congress that enacted subsection (F) in 1940.

Because I fail to perceive the clarity required to vacate the SEC's fee-based brokerage rule under the first step of *Chevron* analysis, I proceed to the second step.

III

Under *Chevron* step two, "if the implementing agency's construction is reasonable," a court must "accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980 (citing *Chevron*, 467 U.S. at 843-44 & n.11).

For the same reasons that I find subsection (F)'s use of the term "such other persons" ambiguous, *see supra* Part II.B, I conclude that the SEC's construction of that term is reasonable. There is nothing implausible about interpreting those words to encompass anyone not actually exempt under one of the five preceding exceptions. In so doing, the SEC does not "rewrite the statute." Court Op. at 19. Rather, it gives effect to one of two plausible interpretations of the statutory language.

The reasonableness of the SEC's interpretation of "such other persons" does not end the analysis, of course. Any regulatory exception must also be consistent with "the intent of" paragraph 11. The remaining question, then, is whether an exception for broker-dealers who provide investment advice solely incidental to their business as broker-dealers, but who are paid fee-based rather than commission-based compensation, is consistent with that intent.

The SEC has presented a reasonable case for concluding that it is. The Commission explained that, at the time of the IAA's passage in 1940, broker-dealers were providing investment advice and receiving compensation in only two

ways: "as an auxiliary part of the traditional brokerage services for which their brokerage customers paid fixed commissions and, alternatively, as a distinct advisory service for which their advisory clients separately contracted and paid a fee." Certain Broker-Dealers, 70 Fed. Reg. at 20,428. Congress was concerned about the potential for fraud and misrepresentation when advice was provided in the latter form -- whether it was provided by broker-dealers charging separately for such advice or by others whose only business was to provide advice for a fee. *See id.* at 20,429-30 & n.60. In enacting the IAA, however, Congress did not express the same concern about investment advice included within a larger package of brokerage services -- as evidenced by the exception contained in subsection (C).

As the SEC interprets the legislative history, subsection (C) was intended to exempt broker-dealers when they gave investment advice as part of a package of traditional brokerage services, but not when they sold advice as a distinct service for a separate fee. *See id.* at 20,430. The 1940 SEC release quoted by the court, Court Op. at 18 n.7, is to precisely that effect:

> Clause (C) . . . amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business, and that it would be inappropriate to bring them within the scope of the [IAA] merely because of this aspect of their business. On the other hand, that portion of clause (C) which refers to "special compensation" amounts to an equally clear recognition that a broker or dealer who is specially compensated *for the rendition of advice* should be considered an investment adviser and not be excluded from the purview of the Act . . . .

11 Fed. Reg. 10,996 (Sept. 27, 1946) (emphasis added) (republishing SEC General Counsel opinion letter of Oct. 28, 1940). Since, at the time, the only kind of compensation that exchange rules permitted a broker-dealer to charge for a traditional package of services was the fixed brokerage commission, subsection (C)'s exception for broker-dealers receiving such compensation effectively exempted all broker-dealers who provided advice as part of such a package. *See* Certain Broker-Dealers, 70 Fed. Reg. at 20,431 & n.75.

For several decades after the IAA was passed, subsection (C)'s "no special compensation" rule -- understood to mean "no compensation other than brokerage commissions" -- continued to exempt the only group of broker-dealers who gave advice as part of a traditional package of brokerage services. *See id.* at 20,431. In 1975, however, the SEC eliminated the requirement that broker-dealers charge only fixed commissions for brokerage services. *See id.* at 20,431 n.74. In the 1990s, broker-dealers began to take advantage of the change by offering their customers fee-based brokerage accounts as an alternative to commissions. According to the SEC, these accounts provide customers with the same traditional package of brokerage services, but instead of paying a commission on each trade, a customer pays either a fixed fee or a fee based on the amount of assets in the account. *See id.* at 20,425.

In 1999, in response to these developments, the SEC first proposed what would become the final rule now before us. The Commission concluded that "these new fee-based brokerage programs . . . were not fundamentally different from traditional brokerage programs" and that broker-dealers had simply "re-priced traditional brokerage programs rather than . . . created advisory programs." *Id.* at 20,426. Although fee-based brokers receive "special compensation" in the technical sense that they are paid in a form other than brokerage commissions, such

brokers provide investment advice only as a part of a traditional package of brokerage services, just like the brokers who have always been exempt from the IAA. And unlike the broker-dealers who Congress intended to include within the Act's coverage via subsection (C)'s bar on "special compensation," the subset of broker-dealers exempted by the final rule do not charge a separate fee or separately contract for investment advice. (The final rule expressly excludes such broker-dealers from the exception. *See* 17 C.F.R. § 275.202(a)(11)-1(b)(1).) Because the SEC reasonably believed that an exception for the broker-dealers covered by the final rule -- a group that did not exist in 1940 -- would serve the same purpose as the exception that Congress created when it passed the IAA, the Commission reasonably concluded that its final rule was consistent with the intent of paragraph 11. As the Commission explained:

> There is no evidence that the "special compensation" requirement was included in section 202(a)(11)(C) for any purpose beyond providing an easy way of accomplishing the underlying goal of excepting only advice that was provided as part of the package of traditional brokerage services. In particular, neither the legislative history of section 202(a)(11)(C) nor the broader legislative history of the Advisers Act as a whole suggests that, in 1940, Congress viewed the form of compensation for the services at issue -- commission versus fee-based compensation -- as having any *independent* relevance in terms of the advisory services the Act was intended to reach.

Certain Broker-Dealers, 70 Fed. Reg. at 20,431 (footnote omitted).

The SEC also reasonably explained why its new exception was consistent with the IAA's more general purpose of

preventing fraud and misrepresentation. As the Commission points out, broker-dealers who are exempt from the IAA are not free from oversight, but instead are regulated under the Securities Exchange Act of 1934 and by self-regulatory organizations such as the New York Stock Exchange. *Id.* at 20,424. That regulation, the SEC explained, "provide[s] substantial protections for broker-dealer customers." *Id.* at 20,433. To supplement that regulation, the final rule further provides that broker-dealers cannot qualify for the exception unless they make specified disclosures about potential conflicts of interest to their customers. 17 C.F.R. § 275.202(a)(11)-1(a)(1).

Moreover, a major impetus to promulgation of the rule was the SEC's concern that commission-based compensation has conflict-of-interest and fraud potential of its own. Charging a commission for each transaction, the SEC said, gives brokers an incentive "to churn accounts, recommend unsuitable securities, and engage in aggressive marketing of brokerage services." Certain Broker-Dealers, 70 Fed. Reg. at 20,425. Under fee-based brokerage programs, by contrast, "compensation no longer depends on the number of transactions . . . , thus reducing incentives . . . to churn accounts, recommend unsuitable securities, or engage in high-pressure sales tactics." Notice of Proposed Rulemaking, 64 Fed. Reg. 61,226, 61,228 (Nov. 10, 1999). The SEC feared that, if fee-based brokers remained subject to the IAA's administrative burdens while commission-based brokers did not, a salutary evolution toward the former would be discouraged. *See* Certain Broker-Dealers, 70 Fed. Reg. at 20,426.

The Financial Planning Association and its *amici* advance a host of reasons to question the SEC's judgment that the fee-based brokerage exception will not undermine investor protection. Whatever the validity of those concerns, they reflect

policy disputes of the type that *Chevron* counsels us to leave to agency resolution.  As the Supreme Court emphasized:

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges -- who have no constituency -- have a duty to respect legitimate policy choices made by those who do.

*Chevron*, 467 U.S. at 866.

## IV

The SEC's interpretation of the Investment Advisers Act is "a reasonable interpretation of an ambiguous statute." *Christensen v. Harris County*, 529 U.S. 576, 586-87 (2000). This is not to suggest that my colleagues' interpretation is unreasonable, but only to acknowledge that when there are two reasonable interpretations of a statutory provision, a court must bow to the "interpretation made by the . . . agency." *Chevron*, 467 U.S. at 844.  Doing so, I respectfully dissent from the opinion of the court.