Deyton v. Estate of Waters, 2013 NCBC 25.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 2582

ROBERT G. DEYTON, JR., M.D., and
YVONNE S. DEYTON,

    Plaintiffs,

    v.

ESTATE OF KENNETH C. WATERS,
JR., Jerry A. Mannen, Jr., Public
Administrator, and MULTI-
FINANCIAL SECURITIES
CORPORATION, individually and as
successor-in-interest to IFG Network
Securities, Inc.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MULTI-FINANCIAL
SECURITIES CORPORATION'S
MOTION FOR SUMMARY
JUDGMENT**

{1}  THIS MATTER is before the court on Defendant Multi-Financial Securities Corporation's Motion for Summary Judgment ("Motion"). After considering the pleadings, evidentiary record, briefs and argument of counsel, the court concludes that the Motion should be GRANTED IN PART and DENIED IN PART.

    *Little & Little PLLC by William B. L. Little and Cathryn M. Little for Plaintiffs Robert G. Deyton, Jr., M.D., and Yvonne S. Deyton.*

    *Williams Mullen by Daniel Lee Brawley and Edward James Coyne III, and Alston & Bird LLP by Theodore J. Sawicki and Todd F. Chatham for Defendant Multi-Financial Securities Corporation.*

    Gale, Judge.

## I. INTRODUCTION

{2}     The Motion raises the central issue of whether Plaintiffs Dr. Robert G. Deyton ("Dr. Deyton") and his wife Yvonne Deyton ("Mrs. Deyton") (collectively, "the Deytons") may by their action filed on June 1, 2010 recover from Defendant Multi-Financial Securities Corporation ("MFSC") because of the theft of several hundreds of thousands of dollars by their son-in-law, Kenneth C. Waters ("Waters"), between 1996 and 2000 while he was a registered representative of MFSC or its merger predecessor, IFG Network Securities, Inc. ("IFG"). MFSC's primary argument is that the Deytons' claims are barred by the statute of limitations because they either knew or should have known, as early as September 1996 and no later than 1997, facts adequate to put them on inquiry notice and to trigger the running of the statute of limitations. The Deytons in turn claim they are entitled to the discovery rule which tolls the running of the limitations period and that there are questions of fact whether they did not know and should not reasonably be expected to have known of the theft until after Waters committed suicide less than three years before the suit was filed. MFSC contends that the Deytons are not entitled to the discovery rule as to claims against MFSC even if they would be entitled to the rule as to claims against Waters. The Deytons contend they have raised facts issues: (1) as to whether MFSC independently owed the Deytons fiduciary duties thereby affording the Deytons the benefit of the discovery rule; and (2) whether Waters was an MFSC employee or agent acting within the scope of his authority so that his liability is imputed to MFSC. The court concludes Plaintiffs have failed to develop evidence adequate to impose an independent fiduciary duty on MFSC, or even assuming such a duty to demonstrate that it was misused for personal benefit adequate to support a claim for constructive fraud as against MFSC, but otherwise, the Parties' respective positions depend upon contested issues of material fact.

## II. PROCEDURAL HISTORY

{3}     Plaintiffs filed their Verified Complaint ("Complaint") in New Hanover County Superior Court on June 1, 2010.  This matter was designated as a mandatory complex business case by Order of Chief Justice Sarah Parker dated July 2, 2010, first assigned to the Honorable John R. Jolly, Jr., and later reassigned to the undersigned.

{4}     Plaintiffs' Complaint asserted claims for fraud, breach of fiduciary duty, and constructive fraud against the Estate of Kenneth C. Waters ("Estate"), and also against MFSC.  On August 12, 2010, MFSC filed its Answer to Plaintiffs' Complaint and asserted cross-claims against the Estate.

{5}     An Entry of Default was entered against the Estate on Plaintiffs' claims on October 14, 2010 and on MFSC's cross-claims on July 5, 2011.  There were various third-party claims which have been voluntarily dismissed.

{6}     On September 14, 2012, MFSC filed the present Motion seeking to dismiss all claims asserted against it.  The Motion has been fully briefed, the court heard oral argument, and the Motion is ripe for adjudication.

## III. STATEMENT OF FACTS

{7}     The court does not make findings of fact when ruling on a motion for summary judgment, but examines whether the record establishes uncontested facts or an absence of necessary facts adequate to demonstrate that the claims should be resolved as a matter of law without the necessity of trial proceedings. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 215 S.E.2d 162 (1975).  The following recitation of facts or contentions is not to find facts but to provide context for the court's ruling.

A.    The Parties

{8}    The Deytons are citizens and residents of Pitt County, North Carolina (Compl. ¶¶ 1, 2), who maintained investment accounts with Waters while he was a registered representative with MFSC or its predecessor, IFG.  (Compl. ¶¶ 5, 7.)

{9}    Defendant MFSC is a Colorado corporation doing business in North Carolina.  (Compl. ¶ 4.)  In January 2004, MFSC acquired and merged with IFG in a transaction leaving MFSC as the surviving corporation assuming all the assets and liabilities of IFG.  (Compl. ¶ 7.)

B.    The Relationship Between the Deytons and Waters

{10}    The Deytons have known Waters since his youth, as Waters' mother was Dr. Deyton's patient.  (Dr. Deyton Dep. 31:9–22.)  The Deytons' daughter, Kara, attended high school with Waters before they were later married in 1991.  (Dr. Deyton Dep. 28:16–24, 33:5–23.)  After the marriage, the Deytons enjoyed a close personal relationship with Waters, and Dr. Deyton participated in many activities with Waters, including golfing, hunting, and fishing.  (Dr. Deyton Dep. 96:17–97:14.)

{11}    Waters and his wife lived near the Deytons' home in Greenville, North Carolina for several years before relocating to Wilmington in 2000, during which time Dr. Deyton saw Waters several times a week.  (Dr. Deyton Dep. 93:21–94:13, 178:19–25.)  In 1995, as Dr. Deyton was approaching retirement, he established several investment accounts with Waters who was then a registered representative with IFG.  (Dr. Deyton Dep. 35:22–37:1.)  Dr. Deyton claims that he relied on IFG's reputation as well as on his relationship with Waters when deciding to invest with IFG.  (Dr. Deyton Dep. 36:21–37:24.)  Dr. Deyton spoke with Waters on the phone on a regular basis and met with him often to discuss his investment accounts.  (Dr. Deyton Dep. 166:8–167:3.)  The record shows little or no interaction between the Deytons and any other IFG or MFSC representative.

{12}     MFSC acknowledges the obvious family relationship between the Deytons and Waters, but contends that there are facts indicating that the Deytons did not depend upon IFG or MFSC with regard to investing. Rather, they contend that that Dr. Deyton had significant personal financial sophistication that belies any assertion that he separately placed the trust and confidence in IFG or MFSC necessary to create a separate fiduciary duty owed by MFSC. MFSC alleges its contention is further amplified by evidence that Dr. Deyton often asked for assurances from Waters when having questions about his accounts but made no further inquiry of IFG or MFSC. MFSC points to evidence of Dr. Deyton's background including his undergraduate and medical degrees from Duke University (Dr. Deyton Dep. 11:7–11); his responsibility for monitoring the retirement fund at his medical practice (Dr. Deyton Dep. 16:6–18:7); his buying and selling individual stocks without the use of a brokerage firm (Dr. Deyton Dep. 15:17–16:5); his purchase and sale of real estate on several occasions (Dr. Deyton 18:8–19:22); his operation of a Christmas tree business (Dr. Deyton 23:9–24:1); and his membership in one or more investment clubs that invested in stocks, bonds and other securities, and real estate. (Dr. Deyton 38:15–54:12.)

C.     Reports Which MFSC Contends Provided Notice to the Deytons of Waters' Malfeasance

{13}     Waters handled several accounts for the Deytons in the period from 1996 to 2009, including Dr. Deyton's personal account, Mrs. Deyton's personal account, and the Deytons' joint account (collectively referred to as "Personal Accounts"). Waters also handled trust accounts and Dr. Deyton's IRA retirement account. All losses at issue were from the Personal Accounts. (Dr. Deyton Dep. 109:4–13.) Plaintiffs allege that starting in August of 1996 and continuing through November 2000, Waters made several unauthorized wire transfers from the Personal Accounts to an account registered to Waters at First Union National Bank. (Pls.' Br. in Opp'n to Def. MFSC's Mot. for Summ. J. (hereinafter "Pls.' Br. in

Opp'n") Ex. J; Breton Dep. 268:1–273:14.) Alleged losses include: (1) $371,500.00 from Mrs. Deyton's personal account (3ND-075443); (2) $206,000.00 from Dr. Deyton's personal account (3ND075609); and (3) $128,000.00 from the Deytons' joint account (3ND075609). (Breton Dep. 271:13–273:14.) Waters accomplished these transfers through fraudulent Letters of Authorization ("LOA") made by cutting and pasting Plaintiffs' signatures. (Breton Dep. 286:18–24, 271:13–272:2, 273:5–14, 342:11–360:11; Pls.' Br. in Opp'n Exs. I, J, K; Pinto Dep. 158:2–159:9.)

{14}    Pershing, LLC ("Pershing") served as the clearing agency for the accounts and provided monthly account statements ("Pershing Monthly Statements"). (Def.'s Mem. in Supp. of Def. Multi-Financial Securities Corp.'s Mot. for Summ. J. (hereinafter "Def.'s Mem. in Supp.") 6.) At some point, the Deytons no longer received Pershing statements on the Personal Accounts but continued receiving them on other accounts. (Dr. Deyton Dep. 167:7–168:1, 322:20–323:6.) Unknown to the Deytons, in August 1997, Waters changed the mailing address for the Personal Accounts to a post office box which Waters controlled. (Breton Dep. 303:18–23.) The Parties have divergent views on whether the Deytons received and reviewed statements on the Personal Accounts between August 1996 and August 1997, it being apparently undisputed that they received and reviewed such statements from April 1996 until August 1996. (Def.'s Mem. in Supp. Ex 7; Dr. Deyton Dep. 163:15–22.) It is also clear that the Deytons continued to receive monthly account statements and other documentation from Pershing relating to their IRA and trust accounts after August 1996. (Dr. Deyton Dep. 167:7–168:1, 322:20–323:6.)

{15}    The Pershing documents related to the Personal Accounts include clear indications that monies were transferred to a First Union account and that interest had been charged because of borrowing on margin. The important question is then whether the Deytons received those reports. Dr. Deyton acknowledges that he did not have an account at First Union and that he would have known that a transfer to this account was improper had he been advised of any such transfer. (Dr. Deyton Dep. 161:14–24.)

{16}    MFSC contends that the record is adequate to determine as a matter of law that the Deytons are charged with knowledge of the improper transfers no later than September 1997.  (Def.'s Mem. in Supp. Exs. 14–16, 18–21.)  Dr. Deyton acknowledges that at some point he noticed discrepancies between Pershing reports and the separate reports that Waters prepared, but he steadfastly denies ever having seen any evidence of a transfer from the Personal Accounts to the First Union account Waters controlled.  (Dr. Deyton Dep. 157:9–158:7, 185:8–18.)

{17}    Starting sometime in 1996, Waters prepared and provided the Deytons fraudulent portfolio statements on the Personal Accounts in lieu of the Pershing Monthly Statements.  (Def.'s Mem. in Supp. Exs. C, W.)  The Deytons argue it is significant that he did so using Centerpiece Software which MFSC knew had been used for fraudulent purposes for other customers.  Waters misrepresented the Deytons' account holdings on their statements by not disclosing margin balances and overvaluing actual account valuations in amounts in excess of $800,000.  (Def.'s Mem. in Supp. Ex. W; Breton Dep. 430:22–434:22, 435:7–441:2.)  Dr. Deyton noted discrepancies between the Pershing reports and those provided by Waters, admits he made inquiry of Waters and accepted his explanations.  (Dr. Deyton Dep. 157:9–158:7, 185:8–18.)  Apparently, Dr. Deyton never made any further inquiry of IFG or MFSC.

{18}    In addition to denying ever having read any Pershing statement indicating an improper transfer, the Deytons forecast evidence they contend is adequate to persuade a jury that Waters prevented their having ever seen such statements.  The record discloses that both opened and unopened documents addressed to the Deytons' home address were found in Waters' possession after his suicide, including Pershing monthly statements on the Personal Accounts that documented the wire transfers.  (Pls.' Br. in Opp'n Exs. P, Q, S, T, U; Pinto Dep. 103:8–122:10, 122:16–128:16, 131:13–140:15.)  MFSC contends but the Deytons deny that some of the pertinent Pershing Monthly Statements had not been taken by Waters and were found in the Deytons' possession.

{19}    Dr. Deyton points to evidence which he contends supports a determination that Waters intercepted the statements from the Deytons' residence during the time when the Pershing statements would have been addressed to the Deytons' personal residence.  Dr. Deyton testified that when Waters lived in Greenville from around 1995 to 2000, his office was only 1.5 miles from the Deytons' home.  (Dr. Deyton Dep. 178:16–179:10.)  Julia Wooten ("Wooten"), the Deytons' housekeeper from 1994 to 2012, testified that while working at the house she remembered Waters coming to the house while the Deytons were away on vacation and bringing in the Deytons' mail from the mailbox (Wooten Dep. 15:22–18:17), but she did not mention it to the Deytons when they returned.  (Wooten Dep. 18:18–20:6.)  She testified that on another occasion when the Deytons were out of town, as she arrived for work at the Deytons' home, Waters came downstairs and told her he had spent the night.  (Wooten Dep. 20:11–22:19.)

{20}    As further evidence that they should not have been expected to have discovered Waters' fraud, the Deytons indicate that their CPA accepted Waters' handwritten tax information related to their accounts without separately demanding written 1099 forms.  (Dr. Deyton Dep. 220:2–221:19, 224:5–18; Farley Dep. 47:18–58:20.)


D.    The Deytons Learn of Waters' Theft From Other Family Members


{21}    In or around April 2009, Waters admitted to stealing money from another Deyton daughter and her husband, Dr. and Mrs. Greg and Nancy Nelson (the "Nelsons").  (Dr. Deyton Dep. 249:9–12, 250:13–21, 246:19–23; 288:14–23; Mrs. Deyton Dep. 53:17–58:13; Nelson Dep. 59:15–60:21, 61:22–64:16, 78:2–80:19.)  Waters then admitted to creating fraudulent records regarding the Nelsons' holdings and began repayment.  (Nelson Dep. 73:23–74:18; Pls.' Br. in Opp'n Ex. NN.)  Following this disclosure, Dr. Deyton made inquiry of Waters about the Deytons' accounts but again accepted Waters' assurance that the Deytons' money

was safe without seeking further assurances from MFSC. (Dr. Deyton Dep. 250:13–252:16; Mrs. Deyton Dep. 57:20–59:14.)

{22} Waters committed suicide in July 2009. His suicide notes and other documents state that he had embezzled hundreds of thousands of dollars from the Deytons' Personal Accounts. (Kara Waters Dep. 51:11–25, 67:1–12; Pls.' Br. in Opp'n Exs. H, QQ, RR, SS, TT, VV, WW.) The Deytons contend they never saw the suicide notes until after the lawsuit was filed, never discussed their contents with Kara Waters (Dr. Deyton Dep. 256:8–259:2), and first learned of Waters' actions relating to their Personal Accounts after Waters' death. (Dr. Deyton Dep. 250:22–251:5, 128:16–23.)

E.   Waters as a Registered Representative of IFG and MFSC

{23} Waters was terminated as a registered representative for Merrill Lynch in 1993 for improperly exercising discretion in a client account on three separate occasions. (Breton Dep. 80:10–81:14.) Waters then became a registered representative for IFG in 1994 and remained until 2004, during which time IFG merged into MFSC. Waters returned to MFSC in 2006. (Def.'s Mem. in Supp. 3, Ex. 1.) Waters and IFG executed a Registered Representative Agreement ("RRA") on May 6, 1994 which, among other provisions, recites that Waters was an independent contractor. The RRA further contains provisions with which Waters was expected to comply. (Def. Mem. in Supp. Ex. 34.)

{24} Plaintiffs complain that MFSC or IFG failed to supervise Waters adequately and improperly withheld information about Waters' improper conduct. In part, they contend MFSC failed to respond when learning that Waters was or might be preparing fraudulent statements using the software program known as Centerpiece, which is the same software Waters used in creating the false statements he provided the Deytons. (Pls.' Br. in Opp'n 12, 13–15; Breton Dep. 204:14–208:5; Goselin Dep. 29:18–25.) Plaintiffs contend that John Goselin, appearing as MFSC's Rule 30(b)(6) designee, admitted that IFG in 2003 had

knowledge of Waters' involvement in a fraudulent real estate scam. (Pls.' Br. in Opp'n 14.) Plaintiffs allege that IFG knew Waters, or persons for whom he had supervisory authority, used the Centerpiece Software to create fraudulent portfolio statements to obtain mortgage lending from mortgage companies that resulted in litigation. (Pls.' Br. in Opp'n 14.)

{25}    Waters had his own company, Heritage Investment Advisors, LLC, at the same time he was a registered representative for IFG or MFSC. This company was registered in North Carolina in 1996, but its registration lapsed in 1998. (Pls.' Br. in Opp'n Ex. FF.) In 2001, the North Carolina Secretary of State Securities Division began an investigation into Waters' possible criminal violation of North Carolina Securities Laws by improperly providing investment advice without being properly registered. (Pls.' Br. in Opp'n Ex. II.) The Deytons assert that IFG was aware of this investigation. (Pls.' Br. in Opp'n Ex. II.)

## IV.  ANALYSIS

A.    Standard of Review

{26}    Summary judgment is proper when the pleadings, depositions, answers to the interrogatories, admissions, and affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. N.C. Gen. Stat. § 1A-1, Rule 56(c) (2009); *Spaulding v. Honeywell Int'l, Inc.*, 184 N.C. App. 317, 320, 646 S.E.2d 645, 648 (2007). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by showing that the opposing party cannot prove an essential element of its claim. *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002). If the moving party meets this initial burden, the opposing party must then present specific facts establishing the presence of a genuine factual dispute for trial. *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982). In ruling on a summary judgment motion, the

evidence is to be viewed in the light most favorable to the non-moving party. *Brown v. City of Winston-Salem*, 171 N.C. App. 266, 270, 614 S.E.2d 599, 602 (2005).

B.      Plaintiffs Have Raised a Sufficient Dispute of Material Fact Adequate to Avoid Summary Judgment That Their Claims Are Time Barred

      1. There Is an Issue of Fact Whether Plaintiffs Knew or Should Have Known of Waters' Malfeasance Outside the Limitations Period

{27}    Different periods of limitation apply to different claims, and the accrual of claims, such as fraud or constructive fraud, may be measured from the date that the plaintiff knew or should have known of facts adequate to constitute notice of his claim. Irrespective of this discovery rule, the Deytons would be time barred as to all claims if they were on notice of their claims earlier than June 1, 2007 for any claims governed by a three-year statute of limitations or before June 1, 2000 for claims governed by a ten-year statute of limitations.

{28}    "When the statute [of limitations] is pled as an affirmative defense, the burden rests on the party asserting a cause of action to remove the bar." *State Farm Fire & Cas. Co. v. Darsie*, 161 N.C. App. 542, 547, 589 S.E.2d 391, 398 (2003). The statutes of limitations for claims of fraud and breach of fiduciary duty are three years, but the beginning of that three-year period may depend on when the aggrieved party knew of the facts upon which the cause of action is grounded. N.C. Gen. Stat. § 1–52(1), (9) (2013). Discovery adequate to trigger the running of the limitations period means either actual discovery or when the facts should have been discovered in the exercise of reasonable diligence under the circumstances. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 386 (2007). Generally, the question of when fraud, in the exercise of reasonable diligence, should be discovered is a question of fact for the jury. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 307, 603 S.E.2d 147, 163 (2004). However, when the evidence is clear and shows without conflict that the claimant had the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law.

*Id.* In some instances, a lack of reasonable diligence may be excused because of a relationship of trust and confidence, but "the principle of leniency does not apply when an event occurs to 'excite [ ] suspicion or put [the aggrieved party] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud.'" *Forbis*, 361 N.C. at 386, 649 S.E.2d at 526; *see also Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 584–85, 581 S.E.3d 68, 73–74 (2003) (affirming Judge Tennille's grant of summary judgment of fraud claim on the basis of the statute of limitations).

{29} MFSC contends that the Deytons were clearly on notice of facts adequate to trigger a duty of due diligence, and they cannot escape being time barred by claiming they reasonably relied on assurances from Waters, particularly when the evidence is undisputed that Dr. Deyton noticed discrepancies in different reports regarding his Personal Accounts. MFSC then contends that, as a matter of law, had Plaintiffs exercised reasonable diligence they would have discovered the basis of their claims as early as September 1996, and no later than the end of 1997. (Def.'s Mem. in Supp. 12.)

{30} The court has grappled with the record in this case. It has actually written both this present Order and another draft order granting summary judgment against all claims on the basis of the statute of limitations. Ultimately, the court concludes that the Deytons have forecast evidence adequate to avoid summary judgment on some claims because the court cannot conclude that the record is sufficiently clear and unequivocal that the Deytons received the Pershing Monthly Statements or other documents that disclose the improper transfers which began in August 1996. There is certainly evidence upon which a jury could conclude such receipt, but the Deytons forecast evidence which support a contrary inference adequate to present to the jury. The court agrees with MFSC that had they received those reports the Deytons would not be excused from further inquiry simply because they trusted Waters and accepted his explanations.

{31} The court struggled with Dr. Deyton's admission that he noticed "quite of bit" of discrepancy between the Pershing Monthly Statements and the portfolio

statements prepared by Waters. (Def.'s Mem. in Supp. 15; Dr. Deyton Dep. 185:8–25.) However, after reviewing Dr. Deyton's deposition testimony carefully, the court was unable to discern the exact discrepancies he noticed or to determine clearly that they related to the improper transfers. The testimony simply is not that precise. (Dr. Deyton Dep. 184:16–185:7, 185:19–25.) When asked specifically, Dr. Deyton denied ever knowing of a wire transfer from the Personal Accounts. (Dr. Deyton Dep. 128:9–23, 161:4–24, 183:20–184:7.)

{32} The court has also carefully examined MFSC's argument that certain of the Pershing statements between September 1996 and August 1997 must be presumed to have been received by the Deytons because they were produced from the Deytons' own files. MFSC argues that before year end 1996, prior to the Pershing statements being redirected to the mail box Waters controlled, Plaintiffs were sent at least 18 documents from Pershing showing unauthorized wire transfers, and that the document production distinguished between those documents that were found at the Deytons' home and those documents later found at Waters' home and produced by his widow. These 18 documents are critical in that they disclose the documents showing the improper transfers were among those produced from the Deytons' home which includes: (1) seven documents showing unauthorized sales of securities in 1997; (2) tax statements revealing margin interest payments in 1996; and (3) account statements showing unauthorized transfers through July 1997. (Def.'s Mem. in Supp. 12–15.) The Deytons' counsel at argument countered that MFSC incorrectly contends that the record supports a finding that these 18 documents had always been in the Deytons' possession before Waters' death simply because they were not among the productions by Waters' widow. (*See* Dr. Deyton Dep. 170:18–172:16, 175:6–17.)

{33} In sum, the court finds that there is a dispute as to the material issue of whether the Deytons received documents adequate to put them on notice of their loss prior to June 1, 2007.

2. Plaintiffs Have Raised Fact Issues Whether Defendant's Knowledge Justifies an Estoppel Against Use of a Statute of Limitations Defense

{34} Plaintiffs contend that they should not be time barred even if there were facts adequate to trigger their inquiry, because there are also facts that should estop MFSC from relying on a statute of limitations defense. The essential elements of equitable estoppel are:

> (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

*White*, 166 N.C. App. at 305, 603 S.E.2d at 162. Ultimately, application of estoppel raises issues of law within the court's province, but resolving facts necessary to determine whether the elements of the claim are met fall within the jury's province. *Id.*

{35} Plaintiffs contend that MFSC should be estopped from relying on the statute of limitations because MFSC was aware but did not inform Plaintiffs that: (1) prior to hiring Waters, Waters was terminated in 1993 from Merrill Lynch for exercising discretion in an account; (2) Waters was acting as an investment advisor while not properly registered; and (3) MFSC knew that Waters used Centerpiece Software to create fraudulent statements in an earlier real estate scam. (Pls.' Br. in Opp'n 48–49.) MFSC contends that the Deytons cannot properly invoke any equitable estoppel defense to being time barred when they clearly admit they were on notice of discrepancies in statements Waters provided but nonetheless accepted his assurances. (Reply Br. in Supp. of Def. Multi-Financial Securities Corporation's Mot. for Summ. J. (hereinafter "Reply Br.") 6.)

{36} The Court of Appeals has previously allowed the doctrine of equitable estoppel to be asserted against an employer where the employee/agent intentionally thwarted plaintiffs from discovering his malfeasance, holding that the defense

ultimately depended upon a jury's determination that the employee was acting within the scope of his employment. *White*, 166 N.C. App. 306–07, 603 S.E.2d at 162–63. Here, as discussed below, there are questions whether Waters was acting as an agent within the scope of his authority when he provided account statements to the Deytons. On balance, the court concludes that the final resolution of the limitations issue, including whether the Deytons have an adequate basis to assert estoppel, should await trial.

### 3. Laches

{37} Defendants contend that the Plaintiffs' claims should be barred by the doctrine of laches even if they are not otherwise barred by the statute of limitations. For the equitable doctrine of laches to apply, North Carolina courts have held:

> 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*Farley v. Holler*, 185 N.C. App. 130, 132–33, 647 S.E.2d 675, 678 (2007) (citation omitted).

{38} MFSC asserts that had Plaintiffs exercised reasonable diligence, Waters' actions would have been uncovered prior to its merger with IFG and it would not be a party to the lawsuit, and further that documents were destroyed, lost, and misplaced over the past 14 years, memories of the relevant witnesses have faded, and some witnesses have died, including Robert Oviatt, the former IFG branch office examiner who conducted IFG's annual compliance reviews of Waters' branch office. (Def.'s Mem. in Supp. 17.) MFSC contends further that even if the Deytons did not have knowledge in 1997, they unfairly delayed in taking action

after learning that Waters had in April 2009 embezzled money from their daughter, Nancy Nelson. (Def.'s Mem. in Supp. 16.)

{39} The court believes that the laches issue revolves around the same facts implicated by the statute of limitations issues, and therefore should also be deferred to trial. The court does not believe a laches defenses can be sustained if the Deytons first learned of the theft in April 2009.

C. Plaintiffs' Claims of Direct Liability of MFSC Are Not Governed by the Discovery Rule

{40} As noted, if the jury finds that the Deytons were reasonably on notice of their claims prior to June 1, 2000, then the discovery rule which might toll the running of the limitations period until such knowledge is irrelevant. However, if the jury concludes that they did not have such knowledge until later, then the Deytons' right to recover would depend upon their entitlement to the discovery rule. As against Waters, their fraud claims receive the benefit of the discovery rule. *See* N.C.G.S. § 1–52(9). The court here addresses whether Plaintiffs have stated a claim of breach of fiduciary duties owed directly by MFSC adequate to invoke the discovery rule for such a claim. The court concludes that they have not, and to the issue of whether MFSC is liable for its own breach of fiduciary duty to the Deytons, MFSC's motion for summary judgment should be GRANTED.

{41} The statute of limitations for claims of fraud and a breach of fiduciary duty based on contract is three years. N.C.G.S. § 1–52(1), (9). While the cause of action based on fraud is not deemed to have accrued until discovery by the aggrieved party of the facts constituting the fraud or mistake, when a breach of fiduciary duty claim is based on a contract, the claim accrues when the cause of action arose. *Id.*; *Scarvey v. First Fed. S&L Ass'n of Charlotte*, 2000 NCBC LEXIS 2, at *6 (N.C. Super. Ct. Feb. 23, 2000); *Marzec v. Nye*, 203 N.C. App. 88, 94, 690 S.E.2d 537, 542 (2010). On the other hand, where the fiduciary duty arises from a special relationship of trust or confidence, the discovery rule may apply so that the

cause of action does not accrue until the claimant knew or should have known of the underlying facts upon which liability is based. *See, e.g.*, *Pittman v. Barker*, 117 N.C. App. 580, 591, 452 S.E.2d 326, 332 (1995); *Dawn v. Dawn*, 122 N.C. App. 493, 495, 470 S.E.2d 341, 343 (1996); *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 68–69, 614 S.E.2d 328, 336 (2005); *Tyson v. N.C. Nat'l Bank*, 305 N.C. 136, 142, 286 S.E.2d 561, 565 (1982).

{42} The court need not determine whether MFSC owed some fiduciary duty arising as a matter of contract because any such claim in now time barred. To avoid the statute of limitations, the Deytons must adequately allege a fiduciary duty based on a special relationship of trust and confidence. Such a relationship arises "wherever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *White*, 166 N.C. App. at 294, 603 S.E.2d at 156 (citing *Vail v. Vail*, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951)). Assuming there is an adequate factual basis from which to determine such a relationship, the issue is generally one for the jury; however, summary judgment may be appropriate where such adequate evidence has not been forecasted. *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 178, 684 S.E.2d 41, 53 (2009).

{43} In their arguments on whether such a relationship existed, the Parties directed significant attention to whether the accounts were discretionary or included a "wrap fee," which Plaintiffs contend would then establish a fiduciary duty. *See Geman v. SEC*, 334 F.3d 1183, 1189 (10th Cir. 2003) (holding that the firm was held to the standard of a fiduciary with respect to customers charged a wrap fee, which is an industry term for an all-inclusive fee to provide brokerage, advisory, and custodial services); *see also Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 375 U.S. App. D.C. 389 (D.C. Cir. 2007); 17 C.F.R. 275.202(a)(11)-1 (2005). Even though there might be some evidence from which other accounts may have included such a fee, there has been no forecast of evidence adequate to classify the Personal Accounts as discretionary or to indicate that a fee was paid for investment advice

regarding those accounts.  As to the Personal Accounts, the only charges were commissions.  (Def'.'s Additional Br. 1.; Reply Br. 8; Dr. Deyton Dep. Exs. 19–20.)  Dr. Deyton's bare assertion that he trusted Waters' advice is not adequate to characterize the Personal Accounts as discretionary.

{44}    Federal courts have recognized a fiduciary relationship when a broker-dealer has de facto control of the account.  *See, e.g, Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951 (1978).  There is no similar North Carolina case.  Here, the evidence may be strong to create a relationship of trust and confidence as between the Deytons and Waters, but the court does not believe the evidence is adequate to conclude separately that the Deytons placed special trust or confidence in IFG or MFSC.  In fact, the Deytons' actions indicate otherwise.

{45}    Even assuming a relationship of trust and confidence, the court has separately considered whether the Deytons have presented evidence that MFSC received a personal benefit adequate to invoke a claim of constructive fraud.  To state a claim for constructive fraud, a plaintiff must show that the defendant took advantage of the fiduciary relationship to benefit him.  *Sterner v. Penn.*, 159 N.C. App. 626, 631, 583 S.E.2d 670, 674 (2003).  "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." *White*, 166 N.C. App. at 294, 603 S.E.2d at 156.  "A plaintiff must allege that the benefit sought was more than a continued relationship with the plaintiff or payment of a fee to a defendant for work it actually performed." *Id.* at 295; 603 S.E.2d at 156 (citation omitted).

{46}    The Deytons seek to prove MFSC's personal benefit in several ways.  First, they contend that they facilitated a prompt completion of wire transfers to protect their own reputation, which would be adversely impacted by any delay in facilitating the transactions.  (Pls.' Br. in Opp'n 45.)  Secondly, they contend they received commissions or interest charges, to which MFSC correctly counters that under North Carolina law, payment for work actually performed and cannot constitute a sufficient benefit to state a claim for constructive fraud.  (Def.'s Mem. in

Supp. 19); *see Sterner*, 159 N.C. App. 626, 632, 583 S.E.2d 670, 674 (2003); *see also Nationsbank of N.C. v. Parker*, 140 N.C. App. 106, 108, 535 S.E.2d 597, 598 (2000). It also does not appear that MFSC itself received interest payments, but instead such charges were for the benefit of the clearing house Pershing.

{47}     In sum, the court does not find adequate evidence to support a special relationship of trust and confidence as between the Deytons and IFG or MFSC, and even if such a relationship did exist, IFG or MFSC misused the relationship for their own personal benefit. Accordingly, Plaintiffs are not entitled to proceed against MFSC directly on a claim for breach of fiduciary duty or constructive fraud, and these claims should be DISMISSED.

D.      Issues of MFSC's Vicarious Liability Must Await Trial

{48}     MFSC contends that the court should determine as a matter of law that Waters was an independent contractor, and even if not he was acting outside the scope of any authority granted to him by MFSC or IFG. The Deytons contend that they have forecasted adequate evidence upon which a jury could determine that Waters was either an employee or agent acting within the scope of his authority. The court finds that there are material issues of fact that must await determination at trial.

{49}     North Carolina law distinguishes between an independent contractor and a servant, employee, or agent. *Hayes v. Bd. of Trs. of Elon College*, 224 N.C. 11, 29 S.E.2d 137 (1944); *Pressley v. Turner*, 249 N.C. 102, 105 S.E.2d 289 (1958). Servants, agents, and employees are subject to the control of the party for whom the work is being done, and due to this control, the doctrine of *respondeat superior* applies. *Pressly*, 249 N.C. at 105, 105 S.E.2d at 292. The principal-agency relationship rests on two essential elements: "(1) authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Holcomb v. Colonial Assocs., LLC*, 358 N.C. 501, 509, 597 S.E.2d 710, 716 (2004) (citing 24 Strong's North Carolina Index 4th *Principal and Agent* § 1 (1993)).

The North Carolina Supreme Court expresses the test for measuring that relationship as requiring an examination if:

> The person employed (a) is engaged in an independent business, calling or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price, or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he thinks proper; (g) has full control over such assistants; and (h) selects his own time.

*Hayes*, 224 N.C. at 16, 29 S.E.2d at 140. No particular factor is controlling, nor is the presence of all required. *Id.* On the other hand, "an independent contractor is 'one who exercises an independent employment and contracts to do certain work according to his own judgment and method, without being subject to his employer except as to the result of his work.'" *Rhoney v. Fele*, 134 N.C. App. 614, 616, 518 S.E.2d 536, 539 (1999) (citation omitted).

{50} Defendant correctly notes the RRA entered between Waters and IFG in 1994 recites that Waters was an independent contractor; however, this designation is not by itself controlling any more than any reference to Waters as a covered "employee" in insurance policies would control. *See Estate of Redding*, 170 N.C. App. at 330, 612 S.E.2d at 669 (holding that although a contract designates an employer-independent contractor, rather than an employer-employee, the terms of the contract are not controlling). Generally, whether one is an independent contractor or an agent or employee is a mixed question of law and fact *Rhoney*, 134 N.C. App. at 616, 518 S.E.2d at 538, but may in appropriate instances reduce to a question of law when the facts could support only one finding:

> [W]here the facts are undisputed or the evidence is susceptible of only a single inference and a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor, but it is only where a single inference can reasonably be drawn from the evidence that the question of whether one is an employee or an independent contractor becomes one of law for the court.

*Yelverton v. Lamm*, 94 N.C. App. 536, 538–39, 380 S.E.2d 621, 623 (1989) (citation omitted).

{51}   The Deytons have forecast evidence which cuts against MFSC's contractual argument. The Deytons forecast evidence from which they contend that a jury could conclude that IFG or MFSC had reason to know of and then condoned or acquiesced in Waters' improper conduct. This forecast is adequate to resist entry of summary judgment. Without further facts, embezzlement might be concluded to be outside an employee's or agent's authority. *See Johnson v.* Schultz, 364 N.C. 90, 94, 691 S.E.2d 701, 704 (2010). However, a mere finding that an employee or agent stole monies is not by itself adequate to compel a finding that she acted outside the scope of her authority. *White*, 166 N.C. App. at 297–98, 603 S.E.2d at 158–59.

{52}   In *White*, the Court cited favorably to Restatement (Second) of Agency § 261 (1958) which provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *Id.* at 298, 603 S.E.2d at 158. The Court also cited *Parsons v. Bailey* stating that "[i]t makes no difference that the agent was acting in his own behalf and not in the interests of the principal when the fraudulent act was perpetrated unless the third parties had notice of that fact." 30 N.C. App. 497, 501–02, 227 S.E.2d 166, 168 (1976). The court then further distinguished two lines of cases following either *B. B. Walker Co. v. Burns Int'l Sec. Servs., Inc.*, 108 N.C. App. 562, 424 S.E.2d 172 (1993), or *Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 105 S.E.2d 428 (1958), noting:

> the difference between cases in which an employee is able to commit a tort solely by virtue of his employment and presence on the employer's premises, and those in which an employee is able to commit a tort by performing the precise tasks that he was hired to do and was held out to the public as authorized to perform.

*White*, 166 N.C. App. at 299, 603 S.E.2d at 159. The dividing line for finding whether an agent can be said to be within or outside his authority is not clear, and the cases seemingly allow for a factual inquiry into whether the principal knew of

some improper conduct by its agent then left the agent in a place from which the wrong could continue. Here, drawing that line requires a trial determination.

{53} In sum, the court concludes that the determinations of whether Waters was an IFG or MFSC agent or employee and if so, whether he acted outside the scope of his authority, must await trial.

## V. CONCLUSION

{54} For the reasons expressed above, MFSC is entitled to summary judgment that the direct claims of breach of fiduciary duty and constructive fraud against it should be dismissed. The Motion should not be otherwise allowed. Accordingly, the Motion is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED, this 25th day of April, 2013.